# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

M.K., by and through his Mother　　:
and Next Friend, MRS. K.,

　　　　　　　　　　　　　　　　:

　　Plaintiffs,

　　　　　　　　　　　　　　　　:

　　　　vs.　　　　　　　　　　No. 3:96cv00482(WIG)

　　　　　　　　　　　　　　　　:

THEODORE SERGI, et al.,

　　　　　　　　　　　　　　　　:

　　Defendants.

　　　　　　　　　　　　　　　　:
----------------------------------X

## RULING ON DEFENDANT SERGI'S
## MOTION FOR SUMMARY JUDGMENT [# 231][1]

Mrs. K., on behalf of and as next friend of her son, M.K., (collectively "plaintiffs"), has brought this action alleging that the defendants violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, and her rights under the Due Process Clause of the Fourteenth Amendment to United States Constitution, made actionable under 42 U.S.C. § 1983. Named as defendants are Theodore Sergi, the former DOE Commissioner, who is sued in his official and individual capacities; Darlene Dunbar, the Commissioner of the Connecticut Department of Children and

---

[1] The original motion for summary judgment [Doc. # 226] was superceded by a corrected motion for summary judgment [Doc. # 231].

1

Families ("DCF"); Karl Kemper, the Regional Administrator for the Eastern Region of DCF; Carissa Lebrun, Kemper's subordinate; the Putnam Board of Education ("Putnam"); John Shea, the former Director of Student Services for Putnam; and Patricia Kline, his successor.

Plaintiffs' consolidated complaint[2] sets forth seven counts. The first count alleges that, as prevailing parties in the special education due process proceedings, plaintiffs are entitled, under 20 U.S.C. § 1415, to an award of attorney's fees and costs against Putnam and DCF. The second count appeals certain aspects of the hearing officer's decisions in the due process proceedings, No. 03-087 and No. 95-353. Plaintiffs' third, fourth, fifth, and seventh counts are expressly directed at defendants other than defendant Sergi. The sixth count, the only count directed at the DOE Commissioner, alleges that defendant Sergi violated M.K.'s rights secured by the IDEA by failing to put in place a hearing process that would enable hearing officers to enter orders against state agencies, such as DCF, which provide services that might impact the provision of a free appropriate public education ("FAPE") under the IDEA.[3]

---

[2] Plaintiffs' complaint has been amended four times since 1996, culminating in the last complaint filed November 18, 2003, which the parties refer to as the "consolidated complaint."

[3] A "free appropriate public education" is defined as:

special education and related services that –

(Consol. Compl. ¶ 137.)  More specifically, plaintiffs allege
that at all times relevant to the complaint, defendant Sergi was
aware that hearing officers were not joining other state
agencies, such as DCF, in hearings under the IDEA and were not
entering orders requiring the provision of community residential
and professional services necessary for a child to benefit from a
FAPE. *(Id.* at ¶ 7.)  On information and belief, plaintiffs allege
that despite defendant Sergi's awareness that M.K. claimed that
he had been unable to live in his home community of Putnam and
attend the local Putnam schools because neither DCF nor Putnam
would provide the necessary services, Sergi failed to act to
provide these individualized services or to put in place an
administrative process that would enable individuals, such as
M.K., to obtain this relief through the administrative hearing
process.  *(Id.)*

Most of plaintiffs' prayers for relief are directed at all
defendants generally.  As to defendant Sergi, plaintiffs ask the

---

        (A) have been provided at public expense,
under public supervision and direction, and
without charge;
        (B) meet the standards of the State
educational agency;
        (C) include an appropriate preschool,
elementary, or secondary school education in
the State involved; and
        (D) are provided in conformity with the
individualized education program required
under section 1414(d) of this title.

20 U.S.C. § 1401(9); *see also* 34 C.F.R. § 300.17.

Court to enter an injunction permanently requiring him

> to establish such safeguards as will enable
> parents of disabled children to join state
> agencies and local school boards in a single IDEA
> hearing in which the hearing officer has the
> authority to order the respondents to provide
> appropriate relief under the IDEA or the ADA.

(*Id.* at 45, ¶ 8.)

Defendant Sergi has moved for summary judgment in this case

on the grounds that he is not a proper defendant to this special

education appeal and that Connecticut's special education due

process hearing system fully complies with all applicable legal

requirements of the IDEA.  For the reasons discussed below, the

Court finds that Sergi was properly named as a defendant in Count

VI, which raises a systemic challenge to the hearing process

established by DOE.  The Court finds, however, that the hearing

process established by DOE complied with the legal requirements

of the IDEA and, therefore, defendant Sergi is entitled to

summary judgment on plaintiffs' claims against him.

### *SUMMARY JUDGMENT STANDARD*

The standard governing motions for summary judgment is well-

settled.  A motion for summary judgment may not be granted unless

the court determines that there is no genuine issue of material

fact and that the moving party is entitled to judgment as a

matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The court must resolve

all ambiguities and draw all inferences in favor of the

non-moving party.  *Id.* at 255.  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper.  *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

Summary judgment has been described as the "most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions."  *A.S. v. Norwalk Bd. of Educ.*, 183 F. Supp. 2d 534, 539 (D. Conn. 2002) (internal quotation marks and citations omitted).  The IDEA provides that "[a]ny party aggrieved by the findings and decision" made by a hearing officer "shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States."  20 U.S.C. § 1415(i)(2)(A).  The district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) bas[e] its decision on the preponderance of the evidence."  20 U.S.C. § 1415(i)(2)(B); *see* 34 C.F.R. § 300.512.  The district court must give "due weight" to the findings and decision of the hearing officer.  *See Hendrick Hudson Dist. Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982).  This deference seeks to ensure that district courts do not "substitute their own notions of sound educational policy for those of the school authorities which they review."  *Id.;  see also Mrs. B. v. Milford Bd. of Educ.,* 103

F.3d 1114, 1120 (2d Cir. 1997).  Thus, in reviewing the findings

and decisions of the hearing officer, the Court must afford

deference and due weight to a hearing officer's findings of fact.

*See Lillbask v. Sergi*, 193 F. Supp. 2d 503, 508 (D. Conn. 2002).

Legal issues, however, regarding the IDEA, other federal and

state statutes, and due process issues under the United States or

state constitutions are reviewed *de novo*, the rationale being

that hearing officers do not have greater experience or expertise

than the courts on such matters. *See Id.; see also Mrs. B. v.*

*Milford Bd. of Educ.*, 103 F.3d at 1122.

### ***FACTUAL BACKGROUND***

M.K. was born on August 31, 1985.  It is undisputed that he

is a "child with a disability" within the meaning of the IDEA, 20

U.S.C. § 1401(3).  (Def.'s Local Rule 56(a)1 St. ¶ 1, admitted by

Pls.)  Over the years, M.K. has been diagnosed with a number of

psychological and emotional difficulties, including Attention

Deficit Disorder with Hyperactivity ("ADHD"), Oppositional

Defiant Disorder, and Dysthymic Disorder.  (*Id.* at ¶ 2, admitted

by Pls.)

Early in his school career, M.K. was identified as

"disabled" by his responsible public school system, Putnam.

(*Id.*, admitted by Pls.)  At all relevant times – with the

exception of a relatively brief period when M.K. was placed in

Riverview, DCF's psychiatric hospital for children, which is part

of Unified School District # 2 ("U.S.D. #2") – Putnam has held planning and placement team meetings ("PPTs") and has developed and implemented M.K.'s individualized educational programs ("IEPs").[4] (*Id.*, admitted by Pls.)[5] Since approximately 1990, M.K. has received a variety of services through Putnam, through DCF and its contractors, and through a variety of private facilities and hospitals. (*Id.* at ¶ 3, admitted by Pls.) Services provided through DCF have included such things as the provision of a mentor for M.K., family and individual counseling, psychiatric hospitalization, respite care, therapeutic foster care, evaluations and assessments, family team support, behavioral support and training, and on-call emergency support. (*Id.*, admitted by Pls.)

Neither Sergi nor DOE has provided any services to M.K. or

_____

[4]     The IEP has been described by the Second Circuit as "[t]he centerpiece of the IDEA's educational delivery system." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Ed.*, 297 F.3d 195, 197 (2d Cir. 2002). It is a written statement developed in a meeting involving a local or State special education representative, the teacher, and the child's parents, that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining "IEP").

[5]     Plaintiffs deny that these PPT meetings held by Putnam complied with the holdings in *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114 (2d Cir. 1997), and *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119 (2d Cir. 1998). That issue, however, is not relevant to this particular motion for summary judgment.

to his family, other than the appointment of an independent special education due process hearing officer, who presided over both due process hearings that are the subject of this lawsuit. (*Id.* at ¶ 5, admitted by Pls.)

M.K. currently resides in an apartment in West Springfield, Massachusetts, and recently completed all course work required for graduation from West Springfield High School. (*Id.* at ¶ 4.) According to plaintiffs, although M.K. participated in the graduation ceremonies, he did not receive his diploma and will not actually "graduate" until the independent consultant determines that all of M.K.'s goals have been met, including his transition goals, at which time he will be exited from special education. (Pls.' Local Rule 56(a)2 St. ¶ 4; Pls.' Mem. at 15.) M.K. continues to receive certain school-to-post-school transition services through Putnam. (Def.'s Local Rule 56(a)1 St. ¶ 4, admitted by Pls.)

### *DISCUSSION*

### *I.  Count II – Appeal of Hearing Officer's Decisions*

Count II of plaintiffs' consolidated complaint appeals the two decisions of the DOE hearing officer.  Plaintiffs do not specifically name any defendants in this count.

Defendant Sergi maintains that he is not a proper party to plaintiffs' appeal of the special education due process hearing officer's decisions, citing *Perreault-Osborne v. New Milford Bd.*

*of Educ.,* No. 3:01cv1251(EBB), Slip Op. at 5 (D. Conn. Mar. 7, 2002). (Def.'s Mem. at 4.) Plaintiffs do not contest this point. (Pls.' Mem. at 2.)

This Court has previously held that neither the Commissioner of DOE nor DOE is a proper or necessary party to an appeal of a hearing officer's decision under the IDEA. *See Fetto v. Sergi*, 181 F. Supp. 2d 53, 71 (D. Conn. 2001); *Perreault-Osborne,* Slip Op. at 5. As this Court held in *Fetto*, "State Defendants are not liable for the decision, even though erroneous, on the part of an independent, impartial hearing officer. Liability may not flow from decisions over which State Defendants have no control and cannot legally influence." 181 F. Supp. 2d at 72 (quoting *Lillbask v. Sergi*, 117 F. Supp. 2d at 192 (internal quotation marks omitted)); *see also Renollett v. Minn. Dept. of Educ.*, No. Civ. 03-6452, 2004 WL 1576716, at *6 (D. Minn. July 13, 2004); *DeMerchant v. Springfield School Dist.*, No. 1:05CV316, 2006 WL 2260057, at *2 (D. Vt. Aug. 7, 2006); *M.T.V. v. Purdue,* No. Civ.A. 1:03CV0468-CA, 2004 WL 3826047, at *10 (N.D. Ga. Feb. 3, 2004).

Based on these holdings, to the extent that plaintiffs are attempting to join Sergi as a defendant in their appeal of the hearing officer's decisions, this Court holds that Sergi may not be named as a defendant to these appeals in either his individual or official capacity. Therefore, summary judgment is granted in

favor of defendant Sergi on Count II of plaintiffs' consolidated complaint.

## II.  *Count VI - Systemic IDEA Violations in the Hearing Process*

On the other hand, this Court has held that the "state education agency is a proper party to actions involving claims of systemic violations of the IDEA." *Fetto,* 181 F. Supp. 2d at 72*; see also D.D. v. New York City Bd. of Educ.*, No. CV-03-2489, 2004 WL 633222, at *22 (E.D.N.Y. Mar. 30, 2004), *vacated in part on other grounds*, 465 F.3d 503 (2d Cir. 2006).  "A systemic claim is one which 'implicates the integrity of the IDEA's dispute resolution procedures themselves, or requires restructuring of the education system itself in order to comply with the dictates of the [IDEA].'" *Fetto*, 181 F. Supp. 2d at 72 (quoting *Mrs. M. v. Bridgeport Bd. of Educ.*, 96 F. Supp. 2d 124, 133 n.12 (D. Conn. 2000)).  In Count VI, plaintiffs have charged Sergi, as DOE Commissioner, with failing to establish a hearing process that would enable hearing officers to enter orders against state agencies, such as DCF, which provide services that might impact the provision of a FAPE under the IDEA.  (Pls.' Consol. Compl. ¶ 137.)  Because this latter claim is of a systemic nature, the Court finds that Sergi has been properly named as a defendant in Count VI.  *See J.B. v. Killingly Bd. of Educ.*, 990 F. Supp. 57, 69 (D. Conn. 1997) (holding that the Connecticut Department of Mental Health was a proper party to an action under the IDEA

which, in part, challenged the DCF-DMH interagency agreement as failing to comply with the requirements of the IDEA).

Turning to the substantive merits of Count VI, Sergi argues that he is entitled to judgment as a matter of law because Connecticut's due process hearing procedures fully comply with the law.[6] He maintains that it is not necessary for the due process hearing officers to join agencies such as DCF as parties to the IDEA due process hearings since under Connecticut's approved system the local education agencies (the "LEAs") alone are responsible for providing special education and related services[7] under the IDEA, regardless of whether a state agency,

---

[6] Alternatively, he argues that, to the extent he has been sued in his individual capacity, he is entitled to qualified immunity on plaintiffs' Count VI. Plaintiffs, however, are not seeking an award of money damages against defendant Sergi and, therefore, this issue of qualified immunity need not be addressed. *See Ford v. Reynolds*, 316 F.3d 351, 356 (2d Cir. 2003).

[7] The term "related services" is defined by the IDEA as

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpretive services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be

such as DCF, has initiated the provision of such services. (Def.'s Mem. at 5-10.)

Initially, plaintiffs assert that this Court must give "due weight" to the administrative findings, in which the hearing officer found that significant problems existed in the coordination of special education services provided by Putnam and DCF. In light of these problems, plaintiffs argue that DOE has not fulfilled its oversight obligations of ensuring that hearing officers have the authority to issue "appropriate" relief, including the joinder of DCF as a party to due process hearings, in cases where both an LEA and DCF provide services necessary to a FAPE. (Pls.' Mem. at 4-6, 9.) They assert, "A hearing system that does not permit a parent to confront and obtain orders against an agency that is undermining a child's right to special education cannot be consistent with 20 U.S.C. § 1415." (Pls'. Mem. in Support of Pls.' Mot. for Summ. Judg. at 72.)

### A. The Statutory Scheme

In order to address plaintiffs' systemic claims challenging the due process hearing procedures, a brief overview of the

---

for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A); *see also* 34 C.F.R. § 300.34.

statutory scheme of the IDEA and implementing State statutes is warranted.

The IDEA is a federal educational statute.  Its purpose is, *inter alia*, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).  To achieve that goal, the IDEA requires states that receive federal funds to designate a state educational agency (often referred to as an "SEA") charged with responsibility for supervising that state's compliance with the IDEA, including administering funds, setting up policies and procedures to ensure local compliance with the IDEA, and filling in for the LEAs by providing services directly to students in need where the LEA is either unable or unwilling to establish and maintain the programs that comply with the IDEA.  20 U.S.C. §§ 1412(a)(11) & (12).

The LEAs are responsible for the direct provision of services under the IDEA, including the development of an IEP for each disabled student, the expenditure of IDEA funds to establish programs in compliance with the IDEA, and the maintenance of records and information that will enable the State educational agency to function effectively in its supervisory role under the IDEA.  20 U.S.C. § 1413.

Although the State educational agency's role is primarily supervisory, the IDEA places the ultimate responsibility on the State educational agency for ensuring that the requirements of the IDEA are met and that "all *educational* programs for children with disabilities in the State, *including all such programs administered by any other State or local agency* – (I) are under the general supervision of the individuals in the State who are responsible for the educational programs for children with disabilities; and (II) meet the educational standards of the State educational agency."  20 U.S.C. § 1412(a)(11)(A)(i) & (ii)(emphasis added).  The statute further states that this provision shall not limit the responsibility of agencies other than the State educational agency to provide or pay for some or all of the costs of a FAPE for any child with a disability.  20 U.S.C. § 1412(a)(11)(B).  The legislative history  indicates that this section was included to "assure a single line of responsibility with regard to the education of handicapped children."  S. Rep. No. 94-168, at 24 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 1425, 1448.

> The Committee considers the establishment of single agency responsibility for assuring the right to education of all handicapped children of paramount importance.  Without this requirement, there is an abdication of responsibility for the education of handicapped children.  Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services

> delivered.  While the Committee understands
> that different agencies may, in fact, deliver
> services, the responsibility must remain in a
> central agency overseeing the education of
> handicapped children, so that failure to
> deliver services or the violation of the
> rights of handicapped children is squarely
> the responsibility of one agency.

*Id.*

In order to ensure that all services necessary to a FAPE are provided, the IDEA requires an interagency agreement or other mechanism for interagency coordination between the public agencies described above and the State educational agency.  20 U.S.C. § 1412(a)(12)(A).  In addition to a method for defining the financial responsibility of each agency, the statute requires the agreement to address the conditions, terms, and procedures under which the LEA shall be reimbursed by other agencies, 20 U.S.C. § 1412(a)(12)(A)(ii); procedures for resolving interagency disputes, including a procedure for the LEAs to initiate proceedings to secure reimbursement from other agencies or otherwise implement the provisions of the agreement, 20 U.S.C. § 1412(a)(12)(A)(iii); and policies and procedures for agencies to determine and identify the interagency coordination of responsibilities of each agency and to promote the coordination and timely and appropriate delivery of services.  20 U.S.C. § 1412(a)(12)(A)(iv).

In terms of the obligations of public agencies other than the LEAs, the statute provides that if any public agency is

obligated under state or federal law, or assigned responsibility under state policy or pursuant to an interagency agreement, to provide or pay for any services that are also considered special education or related services that are necessary to ensure the provision of a FAPE to a child with a disability, such public agency shall fulfill that obligation "either directly or through contract or other arrangement." 20 U.S.C. § 1412(a)(12)(B)(i). If that public agency fails to provide or pay for the special education and related services, the LEA shall provide or pay for them and then seek reimbursement from the public agency that failed or refused to provide or pay for such services. 20 U.S.C. § 1412(a)(12)(B)(ii). The public agency shall then reimburse the LEA pursuant to the terms of the interagency agreement, according to the procedures established in that agreement. *Id.* These requirements can be met through a state statute or regulation or a signed agreement between the respective agency officials, or other appropriate written method. 20 U.S.C. § 1412(a)(12)(C).

The IDEA also contains a comprehensive set of procedural safeguards. 20 U.S.C. § 1415. It requires the State educational agency or LEA that receives federal funding to establish and maintain procedures in accordance with this section "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. §

1415(a).

Relevant to this action are the requirements concerning a due process hearing. The State educational agency or LEA must put in place procedures that include an opportunity for a parent to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6); *see also* 34 C.F.R. § 300.508. After notice to the State educational agency or LEA of a complaint, the statute requires that the parents must have the opportunity for an impartial due process hearing, conducted by an independent hearing officer who is not an employee of the State educational agency or the LEA which is involved in the education or care of the child. 20 U.S.C. § 1415(f)(3). Any party aggrieved by the findings and decision made at the due process hearing may bring a civil action in any State court of competent jurisdiction or in a United States district court, without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2)(A).

In Connecticut, the State Board of Education has been designated by statute as the State coordinating agency.[8]

> (a) The State Board of Education shall provide for the development and supervision of the educational programs and services for children

---

[8] The State Board of Education has promulgated regulations implementing the laws concerning children requiring special education. *See* Conn. Agencies Regs. §§ 10-76a-1, *et seq.*

requiring special education[9] . . .

(c) Said board shall be the agency for cooperation and consultation with federal agencies, *other state agencies* and private bodies on matters of public school education of children requiring special education, provided the full responsibilities for other aspects of the care of such children shall be reserved for such agencies.

Conn. Gen. Stat. § 10-76b (emphasis added). The state statute then places responsibility on the local or regional boards of education to provide the professional services necessary to identify school-age children requiring special education, to prescribe suitable educational programs for eligible children, and to provide special education for those children. Conn. Gen. Stat. §§ 10-76d(a)(1), (b). To meet its statutory obligations, the local or regional board of education may make arrangements with another board, private school, or public or private agency

---

[9] "Special education" is defined by statute as

specially designed instruction developed in accordance with the regulations of the commissioner, subject to approval by the State Board of Education offered at no cost to parents or guardians, to meet the unique needs of a child with a disability, including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings and instruction in physical education and special classes, programs or services, including related services, designed to meet the educational needs of exceptional children.

Conn. Gen. Stat. § 10-76a(4). The statute further defines "child" as any person under the age of twenty-one. Conn. Gen. Stat. § 10-76a(2).

or institution, including a group home, to provide the necessary programs or services.  Conn. Gen. Stat. § 10-76d(d); Conn. Agencies Regs. § 10-76d-1.  If a public agency, other than a local or regional board of education, the State DOE, or the Superior Court, places a child in a foster home, a hospital, or any other residential or day treatment facility, and such child requires special education, the local or regional board of education under whose jurisdiction the child would otherwise be attending school must provide the special education and related services and is responsible for the costs thereof.  Conn. Gen. Stat. § 10-76d(e)(2).

In Connecticut, the State Plan includes, *inter alia*, an interagency agreement between DOE and DCF (Pls.' Ex. 4, Interagency Agreement Between Connecticut State Department of Education and the Department of Children & Families § A),[10] which sets forth the circumstances under which DCF assumes the responsibilities of the LEA under the IDEA.  These are generally limited to children residing within a DCF facility and attending one of the schools in Unified School District # 2.  *See Fetto*,

---

[10]  Under the interagency agreement between DOE and DCF, a child residing within a DCF facility and whose needs require that his or her educational program be provided within that facility on either a full-time or part-time basis is within the jurisdiction of Unified School District #2 (U.S.D. #2).  U.S.D. #2 is responsible for the cost of educational services provided to children within the facility.  The agreement also provides for coordination between the LEA and DCF in terms of educational planning when non-educational residential placements are made.

181 F. Supp. 2d at 69. "However, apart from children in its residential facilities, DCF does not have ultimate responsibility under the IDEA for the education of other children simply because it provides certain services to them." *Id.* at 70. Generally, other than those situations where a student is enrolled in a unified school district, the LEA is responsible under the IDEA for providing a student with disabilities with a FAPE. *Id.*

The State statute further provides for special education hearing and review procedures. A parent or guardian of a child requiring special education may request in writing a hearing whenever the local board or district responsible for providing special education services refuses to initiate or change the educational placement or provision of a FAPE. Conn. Gen. Stat. § 10-76h(a)(1); Conn. Agencies Regs. §§ 10-76h-2(a), 10-76h-3(a). Additionally, the Commissioner of DCF or a "public agency"[11] may request a hearing. Conn. Agencies Regs. §§ 10-76h-2(b), (c). Upon receipt of a request for a hearing, the State DOE appoints an impartial hearing officer, Conn. Gen. Stat. § 10-76h(c)(1), who will hear testimony relevant to the issues in dispute. Conn. Gen. Stat. § 10-76h(c)(3). The party who requested the due

---

[11] "Public agency" is defined by the regulations as "a local or regional board of education, the state vocational-technical school system, a unified school district, or the Department of Mental Health and Addiction Services or any other state agency to the extent such agency is responsible for the provision of special education and related services to children eligible for such services." Conn. Agencies Regs. § 10-76h-1(j).

process hearing has the burden of going forward with the evidence, although the public agency always has the burden of proving the appropriateness of the child's placement or program. Conn. Agencies Regs. § 10-76h-14.

The hearing officer has the authority, *inter alia*, to confirm, modify, or reject the identification, evaluation, or educational placement or the provision of a FAPE to a child or to prescribe alternate special educational programs for the child. Conn. Gen. Stat. § 10-76h(d)(1). Neither the state statute nor the regulations address the hearing officer's jurisdiction over other agencies, such as DCF, in a due process hearing.

The hearing officer must then, in writing, inform the parents or guardians and the LEA of his or her decision. *Id.* If the LEA does not take action on the findings or prescriptions of the hearing officer within fifteen days, the State DOE must take appropriate action to enforce the findings or prescriptions of the hearing officer. Conn. Gen. Stat. § 10-76h(d)(2). Appeals from the decision of the hearing officer may then be taken to the State Superior Court pursuant to Conn. Gen. Stat. § 4-183 or to the federal district court. Conn. Gen. Stat. § 10-76h(d)(4); Conn. Agencies Regs. § 10-76h-16(a).

### B. The Due Process Hearing Decisions and Orders

In this case, two due process hearings were held. The first hearing in 1995, held at a time when M.K. was residing in DCF's

Unified School District #2, addressed the issues of (1) whether
Putnam and/or DCF were responsible for providing certain services
to M.K. in the home, school, and community, including but not
limited to an in-home mentor, 24-hour on-call crisis response
personnel, case management, an inter-agency family team, respite
care, and individual and family therapy; (2) whether the hearing
officer had jurisdiction over DCF with regard to the provision of
such services; and (3) whether Putnam provided a FAPE in the
least restrictive environment.  Plaintiffs moved to join DOE and
DCF as parties, and Putnam also moved to add DCF as a party to
the hearing.  The hearing officer ultimately joined DCF as a
party but refused to join DOE.  The hearing lasted twelve days,
following which the hearing officer rendered her final decision
and order.

Relevant to this motion are her findings that:

(1) she had limited jurisdiction over DCF, *i.e.* when DCF had
M.K. under its supervision and when it provided services that
impacted upon or interfered with M.K.'s ability to benefit from
his special education (Final Decision & Order 95-353, Concl. of
Law ¶ 20);

(2) although DCF was serving as the LEA while M.K. was in
Unified School District #2, certain services provided by DCF were
not "related services" for purposes of the IDEA and, therefore,
were beyond the authority of the hearing officer to order (*Id.* at

¶ 23.)  Specifically, a 24-hour crisis plan with an on-call person for in-home support, respite care for the family, and an in-home mentor were not related educational services (*Id.*);

(3) that she did not have the authority to order DCF to make changes to its policy regarding the time-limits on intensive in-home services (*Id.* at ¶ 25); and

(4) that she did not have the authority over decision-making in a psychiatric hospital concerning whether to use mechanical restraints and locked seclusion (*Id.* at ¶ 26.)

The hearing officer did order DCF to provide on-going representation to Putnam's PPTs to ensure that there was consistency and non-duplication of services between home and school.  DCF was also ordered to cooperate and provide input to the PPT in planning for M.K.'s transition back to the Putnam school district. (Final Decision & Order 95-353, Decision & Order ¶ 1.)  Additionally, she ordered Putnam to send a representative to M.K.'s family team or such other DCF-constituted team to maintain communication and consistency between the home and school.  (*Id.* at ¶ 2.)

In 2003, the same hearing officer held a second hearing at the request of Mrs. K.  Prior to the hearing, Mrs. K. had moved for an order joining DCF as a party.  The motion was argued on

the record[12] and DCF was joined as a party.  (Pls.' Ex. 1,
Hearing Transcript(sealed).)  DCF ultimately sent a letter to the
hearing officer refusing to participate in the hearing.  At the
time of the hearing, M.K. was approaching his eighteenth birthday
and had been living in a therapeutic foster placement in West
Springfield, Massachusetts, for three years.  This placement,
along with therapy and other support services, had been funded by
DCF, which planned to withdraw all funding and support services
on M.K.'s eighteenth birthday.  The services provided by DCF to
M.K. were also the subject of a probate court order, which
required DCF to continue the provision of services or placement
and reunification efforts until M.K.'s eighteenth birthday and to
develop, with the parent and child, a school-to-work transition
plan.  (Final Decision & Order 03-087, Findings of Fact ¶ 28.)

     In this second hearing, the hearing officer found that
Putnam had not provided the appropriate transition services for
M.K. to move from high school to post-high school life.  (Final
Decision & Order 03-087, Conclusions of Law ¶ 8.)  She outlined
the transition services that needed to be provided at least
through the 2003-04 school year.  (*Id.* at ¶¶ 11-12.)   With
respect to DCF, she concluded that, because she had jurisdiction
under Conn. Gen. Stat. § 10-76h(d)(1) to determine whether a FAPE

_____

     [12]  DCF argued that it had been involved with M.K. not
because of educational issues but instead because it was not
appropriate for him to live in his home environment. (Tr. at 11.)

had been provided, she had limited jurisdiction over DCF because the services it had been providing for many years had affected M.K.'s ability to receive a FAPE, and because DCF had been ordered by the Probate Judge to develop a transition plan, which is part of a FAPE. (*Id.* at ¶ 16.) She then ordered DCF to coordinate its school-to-work transition plan with that of the school district to ensure consistency, non-duplication of services, and, ideally, a more appropriate and comprehensive plan. (*Id.* at ¶ 17.) Additionally, once DCF ceased funding services provided to M.K. after his eighteenth birthday, she ordered the school district to provide transition services, which she found were properly the responsibility of the school district. *See* 20 U.S.C. § 1414(d)(5).[13]

Mrs. K. also requested that the hearing officer issue an order prohibiting DCF from terminating the services that were then being provided to M.K. The hearing officer held that she did not have jurisdiction to issue an order concerning DCF's provision of services other than to the extent that she had already ordered DCF to cooperate with the school district concerning transition planning. As to any other area of service,

---

[13] The IDEA, 20 U.S.C. § 1414(d)(5), provides that if a participating agency, other than the LEA, fails to provide the transition services, the LEA must reconvene the IEP ("individualized education program") team to identify alternative strategies to meet the transition objectives for the child set forth in his or her IEP.

she stated that an "[a]ppeal must be made directly to DCF through their own hearing procedures."  (*Id.* at ¶ 20.)

### C. The Hearing Officer's Jurisdiction Over DCF and Other State Agencies

Apparently frustrated by what plaintiffs perceive to be a lack of coordination in the special education services being provided to M.K. by Putnam and DCF, plaintiffs have asked this Court to order DOE to put in place a hearing process whereby the hearing officer can enter orders against State agencies such as DCF where the services provided by the State agency might impact the provision of a FAPE.[14]

The Supreme Court has held that "a court's inquiry in suits brought under § 1415(e)(2) [now § 1415(i)(2)] is twofold.  First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If those requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."  *Rowley*, 458 U.S. at 206-07 (footnotes omitted).  The Supreme Court, emphasizing

_____

[14]  This is the relief sought in Count VI (Pls.' Consol. Compl. ¶ 137.)  In their prayer for relief, plaintiffs' request is significantly broader.  They seek an order requiring DOE to establish procedures that will enable parents to join state agencies and LEAs in a single due process hearing "in which the hearing officer has the authority to order the respondents to provide appropriate relief under the IDEA and ADA."  (Pls.' Consol. Compl. Relief ¶ 8.)

the importance Congress placed on "procedural safeguards" in the IDEA, held that with respect to the first prong of inquiry, the reviewing court must satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act, as well as an IEP for the child in question which conforms with the requirements of the Act.  *Id.* at 206 n.27.  Plaintiffs' claim against defendant Sergi implicates the first prong, that is, whether the State has adopted hearing procedures that comply with the requirements of the IDEA.

Plaintiffs argue that DOE has not fulfilled its oversight responsibilities with respect to the IDEA hearing process, citing the provisions of the IDEA, 20 U.S.C. § 1412(a)(12)(A) and (B)(i), which require DOE to establish through "interagency agreements or other mechanism for interagency cooperation" a procedure to ensure that the services necessary for a FAPE are provided and the procedures to resolve disputes over payment for such services.  (*Id.* at 7.)  Defendant, relying primarily on three decisions, *Fetto v. Sergi,* 181 F. Supp. 2d 53 (D. Conn. 2001), *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114 (2d Cir. 1997), and *Naugatuck Bd. of Educ. v. Mrs. D.,* 10 F. Supp. 2d 170 (D. Conn. 1998), argues that under Connecticut's approved IDEA system, the locus of responsibility for full compliance with the special education laws rests with the LEA and, thus, it is not necessary for the other state agencies to be joined in the due

process hearings in order to fully vindicate a disabled student's rights under the IDEA. Rather, parents and students need only pursue one respondent, their LEA. In its reply brief, defendant asserts somewhat inconsistently that the hearing officer's assertion of limited jurisdiction over DCF was in keeping with these decisions.

Initially, the Court would note that the "due weight" that a reviewing court must ordinarily give to a hearing officer's findings is not implicated here, for plaintiffs' claim concerns a question of law; namely, whether the hearing process put in place by DOE comports with the requirements of the IDEA. *See Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d at 1122.

From a practical standpoint, plaintiffs' position has much appeal, for it would allow a hearing officer to assert jurisdiction over any and all state or local agencies providing services that impact a disabled student's ability to receive a FAPE. As the hearing officer discussed, the needs of children requiring special education services are not neatly compartmentalized into educational and non-educational needs, nor do the responsibilities of the local school board (the LEA) and DCF start and stop precisely at the doors to the student's school and home. Thus, the joinder in one hearing of all agencies providing services to a child that in any way impacted his or her ability to receive a FAPE would seem to promote judicial economy

28

and would allow a hearing officer to provide all-encompassing relief.

However, as appealing as that solution sounds from the standpoint of overall efficiency, it ignores the fact that there is nothing in the state or federal legislation that gives the hearing officers jurisdiction over non-educational state or local agencies, except to the limited extent that they are acting as the LEA.  Additionally, plaintiffs' approach thwarts the Congressional purpose of having one local educational agency responsible for providing an appropriate special educational program even when a child's educational, social, and emotional problems are intertwined.

In *Fetto*, which defendant claims "most closely tracks the factual and legal issues in this case," (Def.'s Mem. at 8), the plaintiff asserted claims against both DOE and DCF.  As to DOE, the plaintiff sought, *inter alia*, an order directing DOE to establish procedures to provide students in an IDEA administrative action with the ability to join in the action any state agency that might have the responsibility under the IDEA to provide educational services.  *Id.*  The Court (Droney, D.J.) found that the plaintiff's claims challenging DOE procedures were moot since the plaintiff, who was twenty-two years of age, had aged out of the State's special education system.  *Id.* at 67.  As to the plaintiff's claim that DCF had violated the IDEA by

failing to provide him with certain services in the "least restrictive environment," by retaliating against him for filing an administrative due process proceeding, and by failing to participate in the PPT meetings, the Court upheld the hearing officer's dismissal of DCF as a party. The Court found that the interagency agreement between DOE and DCF set forth the circumstances under which DCF assumed the responsibilities of the LEAs under the IDEA, which "[w]ith respect to the DCF, . . . are limited to situations where a child attends one of the schools that comprise USD # 2, which . . . included, [*inter alia], . . .* Riverview Hospital." *Id.* at 70. "However, apart from children in its residential facilities, the DCF does not have ultimate responsibility under the IDEA for the education of other children simply because it provides certain services to them." *Id.* "Other than those situations where a child is enrolled in one of the unified school districts, the school system in the town where the child resides [the LEA] is responsible for providing a disabled child with a free and appropriate education under the IDEA." *Id.*

Although it was not clear to the Court whether the services provided by DCF were "related services" that must be provided under the IDEA, the Court held that, even if they were "related services," DCF did not provide these services to the plaintiff in discharge of any duties imposed on it by the IDEA. *Id.* at 70.

Moreover, the Court held

> the fact that the DCF has some [state]
> statutory responsibility to provide
> home-based services to children faced with
> being placed in a residential facility does
> not necessarily lead to liability under the
> IDEA, a statute enacted to assure that
> children with disabilities receive a free and
> appropriate education.

*Id.* The Court noted that the plaintiff had not cited to any precedent holding that the IDEA should be extended to hold agencies and other organizations which provide related services ultimately responsible as LEAs under the IDEA, nor did the Court find the language of the IDEA itself to support such a proposition. *Id.* at 70-71.

Finally, the Court held that the fact that DCF arranged for services that impacted upon the plaintiff's educational performance did not result in its being responsible for the child's education under the IDEA.

> Even if some of the services provided by the
> DCF would also qualify as "related services"
> under the IDEA, the fact that the DCF
> provided them does not make the DCF the LEA
> for the plaintiff, even though the [LEA] may
> have benefitted because it did not need to
> provide the services directly.  Doing so
> would burden the DCF with the financial
> responsibility for providing an appropriate
> education to children assisted by its
> programs.  It also may discourage state
> agencies like the DCF from providing support
> services for children whose education is
> subject to the IDEA.

*Id.* at 71.

Accordingly, the Court held that DCF did not violate the plaintiff's rights under the IDEA by refusing to provide certain requested services, nor could it be liable under the IDEA for providing "related services" to the plaintiff. *Id.* Thus, the Court held that DCF was not a proper party to the due process hearing and upheld the hearing officer's dismissal of DCF as a party. *Id.* In so doing, the Court noted that the dismissal of DCF did not leave a plaintiff, who believes that the related services provided by DCF are deficient, without a remedy. He could pursue his remedies against his LEA, which is "ultimately responsible for compliance with the IDEA, including assuring that the related services are appropriate and properly delivered." *Id.*

Thus, relevant to the issues presented in this case are the Court's holdings in *Fetto* that (1) even if the services being provided by a state agency are considered "related services," that does not render the state agency liable as an LEA under the IDEA, since the responsibility for those related services lies with the LEA; (2) a plaintiff who believes his related services are deficient should pursue his remedies against his LEA, not the state agency providing these services, since it is his LEA that bears ultimate responsibility for compliance with the IDEA; (3) the fact that DCF or another state agency may have some state statutory responsibility to provide home-based services to

children being faced with placement in a residential facility does not necessarily lead to liability under the IDEA; and (4) the fact that a state agency arranged for services that impacted a child's educational performance and abilities does not result in its being responsible for the child's education under the IDEA.

The other two cases cited by defendant, *Naugatuck Bd. of Educ.* and *Mrs. B.*, underscore the breadth of the local school board's responsibility under the IDEA in insuring that a child receives a FAPE.

In *Naugatuck Bd. of Educ. v. Mrs. D.*, 10 F. Supp. 2d 170, 179 (D. Conn. 1998), this Court (Nevas, D.J.) found that, despite the fact that the child's residential placement had been initiated by DCF for non-educational reasons, Naugatuck, as the LEA, was responsible for providing the child with a FAPE under the IDEA. Naugatuck argued that it had provided the child with adequate educational services, including intermittent residential placements, until DCF placed the child in a residential facility for non-educational reasons, for which DCF should bear the non-educational costs of such a placement. *Id.* The Court disagreed, reasoning that "DCF's involvement in [the child's] residential placement does not lessen [the LEA's] responsibilities under the IDEA." *Id.* The Court noted that this was a case where the child's emotional and educational problems intersected. *Id.* at

180-81.  While the child's academic problems were not serious, his social and emotional problems were severe and qualified as educational needs which warranted residential placement.  *Id.* at 181.  Thus, the Court held that the child's "residential placement was a *necessary* component of his special education instruction," for which the LEA was responsible.  *Id.* Significantly, in *Naugatuck*, the hearing officer had refused to join DCF as a party to the due process hearing on the ground that it could resolve the issues without requiring DCF's participation.  *Id.* at 176.

Likewise, in *Mrs. B. v. Milford Board of Educ.*, 103 F.3d 1114 (2d Cir. 1997), the Second Circuit emphasized the overall responsibility of the LEA for the costs of a disabled child's residential placement even though the child had been placed in the residential facility by the Department of Child and Youth Services ("DCYS") (the predecessor to DCF) for non-educational reasons.  The Second Circuit observed that the IDEA "clearly contemplates the need for the support services provided by such [residential] programs in some circumstances."  *Id.* at 1122; *see* 34 C.F.R. § 300.302.  The critical issue, the Court held, in determining whether a school district must fund the residential placement, is "whether the child requires the residential placement to receive educational benefit."  *Id.*  The Court held that, once it was determined that the residential placement was

34

necessary for the child's educational progress, the LEA was responsible for funding the placement, even though the child had been placed there for non-educational reasons. *Id.* The Second Circuit noted that "[t]he fact that a residential placement may be required to alter a child's regressive behavior at home as well as within the classroom, or is required due primarily to emotional problems, does not relieve the state[15] of its obligation to pay for the program under federal law so long as it is necessary to insure that the child can be properly educated." *Id.*

In the instant case, like *Fetto*, the interagency agreement between DOE and DCF, which has been approved by the United States Department of Education,[16] defines the circumstances under which

_____

[15]  As the Court in *Naugatuck Bd. of Educ.* noted, 10 F. Supp. 2d at 180, n.14, this reference to "state" obviously referred to the defendants Milford Board of Education and the Milford Public Schools and not to the State of Connecticut.

[16]  The Court in *Fetto* found "highly persuasive" the fact that the State Plan had been approved by the United States Department of Education.  181 F. Supp. 2d at 73.  The Court concluded that the Connecticut DOE

> need not develop specific rules and
> procedures requiring the DCF (as an LEA) to
> provide services for children in public
> school where the DCF is not responsible for
> providing such children with an appropriate
> education.  The fact that the state's plan
> does not include an interagency agreement for
> students like the plaintiff who have not been
> placed in a residential facility does not
> violate the IDEA or its accompanying
> regulations, and the state has complied with

DCF acts as an LEA.  Those circumstances are not implicated in
either of the due process hearings at issue in this case.  The
agreement also provides for coordination between the LEA and DCF
in terms of educational planning when non-educational residential
placements are made.  However, under the IDEA, it is the LEA that
bears ultimate responsibility for identifying children requiring
special education, prescribing appropriate educational programs
for these children, and providing those special education
services.  Although there are instances when non-educational
agencies, such as DCF, will provide related services impacting on
the child's ability to receive a FAPE, it is the LEA that is
responsible for a child's special education needs, and it is the
LEA against which plaintiffs must pursue their remedies, not DCF.
Therefore, there was no error in DOE's failing to develop
procedures for plaintiffs to join agencies like DCF in due
process hearings.

Except in those instances in which DCF acts as the LEA, the

---

the mandates of the federal law.

*Id.* at 73.  The Court noted that it was not the State's
responsibility to develop interagency agreements to assure that
students are kept *out* of residential facilities.  *Id.* at 74.
"The state's responsibility is to assure that children receive a
'free appropriate education' through LEA's, and to the extent
possible, one in the least restrictive environment.  This does
not require the state to always seek to prevent children from
being placed in residential facilities, when such a placement is
otherwise appropriate."  *Id.*

proper respondent in a due process hearing is the local school board, the plaintiff's LEA, not DCF, even though DCF may be providing services that impact on the provision of a FAPE.

In this case, the hearing officer's first decision was issued at a time when M.K. was under DCF's supervision in Unified School District #2. She appropriately asserted limited jurisdiction over DCF to the extent that DCF was acting as the LEA in providing educational services as part of M.K.'s residential placement in Unified School District #2. (Final Decision & Order 95-353, Concl. of Law ¶ 20.) However, at all other times when Putnam was serving as the LEA, including at the time of the second due process hearing, the hearing officer had no authority to join DCF as a party to the due process hearing.

Plaintiffs' request that the Court order DOE to put in place a hearing process that would enable hearing officers to join *any* state agency which provide services that "*might* impact the provision of a free appropriate public education to a child identified as in need of special education and related services under the IDEA" would extend the hearing officer's jurisdiction to matters far beyond the reach of the IDEA (Pls.' Consol. Compl. ¶ 137)(emphasis added); *see New Hampshire Dep't of Educ. v. City of Manchester*, Civil No. 94-573-M (D.N.H. Mar. 21, 1996) (Slip Op.); *but see J.B. v. Killingly Bd. of Educ.*, 990 F. Supp. at 67 (holding that the Department of Mental Health was a proper party

to an action under the IDEA).  Thus, the Court finds that plaintiffs are not entitled to the relief sought in Count VI against defendant Sergi or DOE, and grants summary judgment in favor of defendant Sergi as to Count VI.

### *CONCLUSION*

For the reasons set forth above, defendant Sergi's Motion for Summary Judgment [Doc. # 231] is GRANTED.

SO ORDERED, this ___30th___ day of March, 2007, at Bridgeport, Connecticut.


                                    ___*/s/ William I. Garfinkel*___
                                    WILLIAM I. GARFINKEL
                                    United States Magistrate Judge