# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

M.K., by and through his Mother     :
and Next Friend, MRS. K.,

                              :

     **Plaintiffs,**

                              :

        **vs.**                        **No. 3:96cv00482(WIG)**

                              :

**THEODORE SERGI, et al.,**

                              :

     **Defendants.**

                              :
----------------------------------X

## <u>RULING ON PUTNAM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [# 227]</u>

Mrs. K., on behalf of and as next friend of her son, M.K., (collectively "plaintiffs"), has brought this action alleging that defendants violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, and her rights under the Due Process Clause of the Fourteenth Amendment to United States Constitution, made actionable under 42 U.S.C. § 1983. Named as defendants are Theodore Sergi, the former Commissioner of the Department of Education ("DOE"); Darlene Dunbar, the Commissioner of the Connecticut Department of Children and Families ("DCF"); Karl Kemper, the Regional Administrator for the Eastern Region of DCF; Carla Lebrun, Kemper's subordinate; the Putnam Board of Education ("Putnam"); John Shea, the former Director of Student Services

1

for Putnam from October 5, 1994 to June 30, 1999, who is sued in his individual capacity; and Patricia Kline, his successor as Director of Student Services from August 2, 1999, to May 20, 2002, and who is also sued in her individual capacity.[1]

As to the Putnam defendants, plaintiffs' consolidated complaint[2] alleges that Shea and Kline were familiar with M.K. and participated in virtually all team meetings, hearings, and court proceedings relating to M.K.'s case.  They allege that these defendants were in a position to provide the professional and residential supports M.K. needed to remain at or to return home but they refused to pay for these services as well as any other services they deemed to be "non-educational."  (Pls.' Consol. Compl. ¶ 6.)  The complaint contains seven counts.  The first count alleges that, as prevailing parties in the special education due process proceedings, plaintiffs are entitled, under 20 U.S.C. § 1415, to an award of attorneys' fees and costs against Putnam and DCF.  The second count appeals certain aspects of the hearing officer's decisions in the Connecticut State Department of Education due process proceedings, No. 03-087 and No. 95-353.

_____

[1]  The Putnam Board of Education, John E. Shea, and Patricia M. Kline are referred to collectively as "the Putnam defendants."

[2]  Plaintiffs' complaint has been amended four times since 1996, culminating in the last complaint filed November 18, 2003, which is referred to by the parties as the "consolidated complaint."  It encompasses plaintiffs' claims in cases No. 3:96cv00482(WIG) and No. 3:03cv1505(WIG).

Plaintiffs' third, fourth, sixth, and seventh counts are expressly directed at defendants other than the Putnam defendants. The fifth count is the only count addressed exclusively against the Putnam defendants and alleges that they acted intentionally and/or in reckless disregard of plaintiff's rights under the ADA, § 504 of the Rehabilitation Act, the IDEA, and 42 U.S.C. § 1983, by:

> a. Establishing and implementing policies and procedures which ensured that M.K. could not receive the support needed to be educated in the Putnam schools; and
>
> b. Refusing to authorize the Putnam PPT to make placement or program decisions after DCF placed M.K. with DCF-funded services.

As a result of these alleged actions, plaintiffs charge that the Putnam defendants denied them the opportunity to use the IDEA dispute resolution and hearing process to resolve disputes over program and placement decisions made by the DCF treatment team, and M.K.'s ability to establish relationships with adults and children has been impaired. (Pl.'s Consol. Compl. ¶¶ 135 & 136.)

As relief against the Putnam defendants, plaintiffs seek an order requiring defendants to fully and faithfully implement the orders of the Hearing Officer; an order requiring defendants to pay attorneys' fees and costs in connection with these consolidated lawsuits and underlying administrative hearings; an

order requiring defendants to maintain funding for M.K.'s
therapeutic foster placement until transition planning is
completed; an order requiring defendants to provide an
appropriate array of support services in the community and school
so that M.K. can continue to live in the community and attend
public school; an order reversing certain aspects of the hearing
officer's decisions; and an award of compensatory and punitive
damages against defendants for acting in reckless disregard of
plaintiffs' rights under the ADA, § 504 of the Rehabilitation
Act, the IDEA, the Fourteenth Amendment, and 42 U.S.C. § 1983,
and for defendants' failure to provide necessary individualized
services to M.K. that has resulted in his prolonged and
unnecessary separation from his family.  (Pls.' Consol. Compl. §
V, ¶¶ 1, 2, 4-6, 12-13.)

    The Putnam defendants answered denying any liability to
plaintiffs, and Putnam asserted a counterclaim appealing that
portion of the hearing officer's decision in Case No. 03-087 that
directed Putnam to pay for M.K.'s psychotherapy and for the
psychiatric supervision of his medication regimen, which were
services already being paid for by DCF and which, it maintained,
were not necessary educational services. (Counterclaim ¶¶ 1, 39,
40.)

    The Putnam defendants have moved for the entry of summary
judgment in their favor on the second and fifth counts of

4

plaintiffs' consolidated complaint[3] and on its counterclaim.

***SUMMARY JUDGMENT STANDARD***

The standard governing motions for summary judgment is well-settled. A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.* at 255. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

However, with respect to IDEA appeals, the court's inquiry is not directed to ascertaining whether there are disputed issues of material fact, but rather whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA processes and that the child's educational needs have been appropriately addressed. *A.E. v. Westport Bd. of Educ.*, 463 F. Supp. 2d 208, 215 (D. Conn. 2006). "The Supreme Court and [the Second] Circuit have interpreted the

_____

[3] Putnam has not moved for summary judgment on Count I, which is plaintiffs' claim for attorneys' fees and costs.

5

IDEA as strictly limiting judicial review of state administrative decisions." *Collins v. Board of Educ. of Red Hook Central School Dist.*, 164 Fed. Appx. 19, 2006 WL 93102, at *2 (2d Cir. Jan. 9, 2006).

The IDEA provides that "[a]ny party aggrieved by the findings and decision" made by a hearing officer "shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A). The district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) bas[e] its decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(B); *see* 34 C.F.R. § 300.512. Summary judgment has been described as the "most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions." *A.S. v. Norwalk Bd. of Educ.*, 183 F. Supp. 2d 534, 539 (D. Conn. 2002) (internal quotation marks and citations omitted).

Federal courts reviewing administrative decisions under the IDEA must base their determinations on a "preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." *Walczak v. Florida Union Free School Dist.*, 142 F.3d 119, 122-23 (2d Cir. 1998); *see also Grim v. Rhinebeck Central School Dist.*, 346 F.3d 377, 380 (2d Cir. 2003). Although the district court is required to

engage in an independent review of the administrative record, this assessment "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Hendrick Hudson Dist. Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982) (considering the Education for All Handicapped Children Act, subsequently amended and renamed IDEA); *see also Cabouli v. Chappaqua Central School Dist.*, 200 Fed. Appx. 519, 521 (2d Cir. 2006). "The IDEA's statutory scheme requires 'substantial deference to state administrative bodies on matters of educational policy.'" *A.E. v. Westport*, 463 F. Supp. 2d at 215 (quoting *Cerra v. Pawling Central School Dist.*, 427 F.3d 186, 191 (2d Cir. 2005)). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak,* 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206, 208 (internal quotation marks and citation omitted)); *see also Cabouli*, 202 Fed. Appx. at 521; *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1120 (2d Cir. 1997); *M.H. v. Monroe-Woodbury Central School Dist.*, 250 Fed. Appx. 428, 430 (2d Cir. 2007) (reversing judgment of district court where it failed to give "due weight" to the administrative findings); *Lillbask v.*

*Sergi*, 193 F. Supp. 2d 503, 508 (D. Conn. 2002) (in reviewing the findings and decisions of the hearing officer, the Court must afford deference and due weight to a hearing officer's findings of fact). "Deference is particularly appropriate when, as here, the state hearing officer's review has been thorough and careful." *Walczak*, 142 F.3d at 129. Legal issues, however, regarding the IDEA, other federal and state statutes, and due process issues under the United States or state constitutions are reviewed *de novo*, the rationale being that hearing officers do not have greater experience or expertise than the courts on such matters. *See Lillbask*, 193 F. Supp. 2d at 508; see *also Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997).

## *FACTUAL BACKGROUND*[4]

M.K. was born on August 31, 1985. His mother and biological father separated before his birth, and he remained in the care of his mother, Mrs. K.

M.K. suffers from numerous disabilities, including Attention Deficit Disorder with Hyperactivity, Oppositional Defiant Disorder, and Dysthemic Disorder. These disabilities have resulted in serious behavior problems in M.K.'s home and at school.

M.K. began his elementary education in the Putnam public

---

[4] The following facts are taken from the Putnam defendants' Local Rule 56(a)1 Statement and are admitted by plaintiffs unless otherwise indicated.

school system in 1990 in Putnam, Connecticut, where his familial home is located.  In kindergarten, Putnam identified M.K. as a child in need of special education services as a result of his various disabilities.  After an interdisciplinary evaluation of M.K. was done at the Newington Children's Hospital in February 1991, Putnam's planning and placement team ("PPT") met on May 20, 1991, and placed M.K. in special education classrooms 26 hours per week and 3.5 hours per week in regular classrooms.  The PPT reported that M.K. was doing well academically and was ready for the first grade curriculum with special education support for his behavior.  The PPT developed an individualized education program ("IEP") for M.K. for first grade that called for 26 hours per week in special education, 3.5 hours per week in the regular classroom, and .5 hours of counseling per week with the school psychologist.  PPTs were held several times during M.K.'s first grade year.  Generally appropriate behavior was reported in November, and, although behavioral difficulties were noted at a PPT meeting in January 1992, it was reported that M.K. was making consistent but gradual academic progress.

Mrs. K. re-married in February 1992.  M.K. had some problems with the new marriage, for which he received counseling, which proved somewhat successful.

M.K. did fairly well in second grade, 1992 to 1993.  A PPT convened halfway through the year noted that M.K. had positive

peer relationships and grade-level academic skills. His special education hours had been reduced earlier in the year because of his "excellent" progress.

M.K. began third grade in 1993 in the mainstream classroom. As a result of his declining and disruptive behavior, a PPT was convened in October, and M.K. was returned to the special education classroom on a full-time basis. On November 2, 1993, Mrs. K. requested the PPT to have a full psychiatric and educational assessment of M.K. performed at Elmcrest Psychiatric Hospital ("Elmcrest") in Portland, Connecticut. The Putnam PPT agreed to pay for that portion of the assessment not covered by Mrs. K's insurance.

On November 3, 1993, M.K. entered Elmcrest. His admission was changed to a residential placement on the recommendation of his psychiatrist after learning of specific instances of M.K.'s oppositional defiant and aggressive behavior. While at Elmcrest, M.K. attended daily classes. Informal assessments showed that he was working at grade level in math and language.

DCF first became involved with M.K. and his family when Elmcrest reported possible abuse of M.K. by his stepfather. (Pls.'s Consol. Compl. ¶ 12.) After an investigation, DCF determined that inappropriate punishment had been used but that protective custody was not warranted, and the case was closed on December 6, 1993.

On November 15, 1993, M.K. was transferred from Elmcrest to Natchaug Hospital in Mansfield Center, Connecticut, at the request of Mrs. K. after she learned that he had been sexually abused by another patient at Elmcrest. M.K. attended the Children Unit School Program at Natchaug where he earned grades of A's and B's. M.K. was discharged from Natchaug on December 3, 1993.

As a result of a PPT meeting on December 6, 1993, M.K. returned to the Putnam public schools and was placed in a special education classroom with a plan to return him gradually to regular classes. By February, 1994, M.K. was spending most of his time in regular classes and was receiving counseling from the school psychiatrist one-half hour per week.

M.K. was admitted to Mount Sinai Hospital in Hartford on July 22, 1994, after his babysitter reported that M.K. had held his 16-month-old brother under water. The treating professionals at Mount Sinai, however, did not find M.K. to be a behavior problem in the hospital and recommended his discharge to a day treatment program. Because Mrs. K. believed that she could not manage M.K. at home without support, she requested services from DCF, including a foster placement until the appropriate family support services could be put in place.

On July 29, 1994, M.K. was discharged. Approximately one week later, he was admitted to Joshua Center Child Partial

Hospitalization Program, which is affiliated with Natchaug.  He
continued in this program until August 29, 1994.

In August, Mrs. K. again requested placement services from
DCF, and on August 25, 1994, DCF began providing Intensive Family
Preservation Services for M.K. and his family.  In early
September 1994, DCF made M.K. a "Protective Services" case.  The
Intensive Family Preservation Services included a mentor to go to
his house and wake him so that he could attend school.  The
mentor also provided services in the afternoons to M.K. and his
family.  Mrs. K., however, believed that the 20 hours/week
provided by the mentor was insufficient.

Shortly after the beginning of M.K.'s fourth-grade year, a
PPT was convened.  His fourth-grade teacher reported that M.K.'s
class performance was appropriate and on task.  The PPT
recommended a pediatric neurological evaluation, for which Putnam
agreed to pay the costs not covered by the family's insurance.
The PPT also recommended that DCF be contacted about the
provision of other possible services.  M.K. was to remain in the
regular classroom with one hour and forty minutes per week in the
special education classroom and one half hour of weekly
counseling.  On September 12, the PPT reconvened and it was
reported that M.K. was making steady academic and behavioral
progress.  Other than a three-week period in January 1995,
discussed below, when M.K. was admitted to Natchaug Hospital,

M.K. attended the public school in Putnam for the fourth grade.

Because of the pool incident, M.K.'s behavior and the stress M.K. was causing within his family, Mrs. K. requested that DCF temporarily place M.K. in a local foster care home. This was accomplished on October 3, 1994, and was funded by DCF. M.K. continued to attend the Putnam public schools.

On October 5, 1994, defendant John Shea became the Director of Student Services for the Putnam Board of Education. During his tenure as Director of Student Services, defendant Shea participated in virtually all PPT meetings, hearings, and court proceedings concerning M.K.

On December 20, 1994, a neurological evaluation of M.K. was completed, which produced normal results. The evaluator believed that M.K.'s problems were primarily psychiatric.

On December 31, 1994, at the request of the foster family, Mrs. K. brought M.K. from the foster home to a DCF-funded respite care home arranged through DCF. That night, M.K. behaved aggressively, destroying property in the respite care home. Upon his return to foster care, his aggressive behavior continued. On January 3, 1995, the foster mother sent him to the emergency room at Natchaug Hospital due to his aggressive behavior, where he remained until January 27, 1995. Mrs. K. paid for M.K.'s hospitalization.

On January 10, 1995, Mrs. K. requested a due process hearing

pursuant to the IDEA.  The administrative proceeding was designated as Case No. 95-353.

A PPT was convened on January 18, 1995, to prepare for M.K.'s discharge from Natchaug and his return to Putnam.  A teacher from Natchaug reported that he had done well there and was ready to return to school.

Beginning in January, DCF provided a mentor for M.K. five mornings a week, from 6:00 a.m. to 7:30 a.m., and for two to six hours on the weekends.

On January 23, 1995, M.K.'s IEP was amended to include one-half hour each week of individual and group counseling.  On February 10, 1995, a PPT was convened to review M.K.'s educational progress.  He had received A's and B's while at Natchaug, but was unable to participate in small groups.  At Putnam, it was reported that he had incidents of verbal abuse and aggression and non-compliant behavior.  The special education teacher stated that he had made academic progress over the last year.  The PPT recommended continuing with the educational plan and related counseling, which called for 23.33 hours of regular education and 2.67 hours of special education and counseling per week.

On March 1, 1995, a PPT meeting was held to develop an IEP to address M.K.'s increasingly serious behavior problems.  The PPT recommended that a paraprofessional be assigned to M.K. on a

1:1 basis to provide direct intervention when he experienced difficulties in the classroom and to coordinate with the special education teacher to re-channel M.K.'s disruptive behavior. The PPT also recommended that behavior modification plans be coordinated between home and school. A paraprofessional was hired by Putnam to help M.K. remain in the regular classroom for longer periods of time. That month, M.K. also had two incidents of acting out at home, one of which caused Mrs. K. to take him to the emergency room.

On April 25, 1995, the Hearing Officer ordered Putnam to hire an independent consultant to develop a behavior plan to be implemented at home and at school. The consultant, Terry D. Williams, a licensed psychologist, was to begin immediately so that a plan would be ready for implementation for the 1995-96 school year.

The next PPT was convened on May 19, 1995, to plan for the rest of M.K.'s fourth grade and his fifth grade the following school year (1995-96). Mrs. K. requested that Putnam provide day care, respite care, and crisis intervention as related services, but those requests were turned down. M.K.'s special education teacher and his regular teacher reported that he was making progress. The PPT recommended that the current IEP be continued for the rest of the school year and the following year. His special education teacher was also to contact Mrs. K. every day

after school regarding his homework.  The PPT, however, refused to provide a summer program for M.K. during the summer of 1995.

On June 19, 1995, DCF filed a neglect petition in Superior Court asserting that M.K. should be removed from his family, which was unable to meet his needs.  A hearing on the petition was postponed by agreement of the parties.

On July 28, 1995, M.K. was admitted to Natchaug Hospital following a behavioral incident at home.  He remained there until August 10, 1995.  Upon his discharge, he returned home and attended a partial hospitalization program at the Joshua Center.  DCF provided an array of services to the family during this time, including weekly family meetings, a mentor who came to the house every morning to help M.K. awaken and prepare for school, a person who could be paged from 9:00 p.m. to 6:00 a.m. to provide support and consultation if a difficult situation arose, and a respite worker who took M.K. on short outings for two and a half hours per week.

In August, Mrs. K. filed a motion with the Juvenile Court to have DCF conduct an inpatient evaluation of M.K.  On August 23, 1995, this request was granted and DCF was ordered to admit M.K. to Riverview Hospital, a DCF-operated psychiatric hospital in Middletown, Connecticut, for a thirty-day psychiatric evaluation.  Because there were no beds available at Riverview, M.K. remained at home, during which time M.K. had a serious behavioral incident

at home.

On August 31, 1995, the PPT met to review M.K.'s program in light of his participation at the Joshua Center. The PPT agreed to have M.K. spend part of his day in his neighborhood school and part of his day at the Joshua Center Partial Hospitalization Program. The family disagreed and renewed it request for individualized support services. Although this request was not granted, Putnam and Natchaug did agree to work together to coordinate a behavior program, and his regular and special education teachers also agreed to meet regularly to discuss his progress.

On September 6, 1995, M.K. ran away from home following a violent argument with his mother. Mrs. K. called the police and M.K. was taken to the Day Kimball Hospital emergency room in Putnam, which in turn arranged for his admission to Mount Sinai Hospital Acute Behavioral Clinic. On September 14, Mount Sinai transferred M.K. to Riverview for a court-ordered thirty-day evaluation. M.K. remained at Riverview, where he attended DCF's Unified School District No. 2 ("U.S.D. #2")[5] on the grounds of Riverview until April 12, 1996. While M.K. was at Riverview, treatment decisions were made by the psychiatric team providing his care, including decisions about the use of restraints and

---

[5] U.S.D. #2 was established by DCF pursuant to state statute to provide education to children whose needs require education within a DCF facility.

seclusion "time-outs." Mrs. K. objected to the staff making these decisions without her consent. Instead, she wanted the staff at Riverview to telephone her to obtain her permission before they employed any restraint with M.K.

During the time M.K. attended U.S.D. #2, DCF acted as M.K.'s local education agency ("LEA"), although Putnam paid the cost of M.K.'s participation at U.S.D. #2. The parties dispute whether M.K.'s stay at Riverview was voluntary.

On February 20, 1996, following a twelve-day hearing, the Hearing Officer issued her decision in Case No. 95-353. Among other things, she found that Putnam had not supplied sufficient supplementary aids and services with regard to M.K.'s behavior to consistently maintain M.K. in the least restrictive environment and to avoid the frequent movement between the mainstream and special education classrooms (Concl. of Law ¶ 3); that Putnam had failed to implement any parent counseling or training, a related service under 34 C.F.R. § 300.16 (*id.* at ¶ 8); that the PPT had never received any ongoing expert advice on M.K.'s medications and psychiatric condition (*id.* at ¶ 10); that M.K. had not been provided the services he needed to be consistently maintained in the least restrictive environment (*id.* at ¶ 16). She ordered that Putnam and DCF provide representation to each other's team meetings to ensure consistency and non-duplication of services between home and school (Decision and Order ¶¶ 1, 2); that Putnam

retain a consultant to design a behavioral management plan for home and school (*id.* at ¶ 3); that M.K.'s psychiatrist or other expert serve as a clinical advisor to the PPTs and provide input on his medications and clinical and therapeutic needs (*id.* at ¶ 4); that Putnam hire an educational consultant to assist the PPT in developing an appropriate IEP, to provide training to the staff, and to monitor the implementation of all components of M.K.'s educational program (*id.* at ¶ 5); and that Putnam assign a full-time paraprofessional to M.K.'s classroom, upon his return to the Putnam school system, to provide behavioral support (*id.* at ¶ 6).

On March 19, 1996, Mrs. K. commenced this action, Case No. 3:96cv0482, seeking both a temporary restraining order ("TRO") and a preliminary injunction. Through the TRO, Mrs. K. sought to prohibit DCF from requiring her to surrender custody of M.K. in order to obtain continued funding for DCF services and to prohibit DCF from discharging M.K. to his home without adequate in-home services. On March 21, 1996, the TRO was denied upon the representation of DCF's counsel that DCF would pay for M.K.'s residential placement at Harmony Hill, a residential facility for children in Rhode Island, without the necessity of Mrs. K.'s surrendering custody of M.K. Thus, on April 15, 1996, M.K. was admitted to Harmony Hill.

While Mrs. K. wanted M.K. to return home with "wrap-around"

services[6] provided by DCF and argued that it would be safe for him to do so, Dr. Sadler, an independent court-appointed evaluator, Dr. Leebens, M.K.'s treating psychiatrist, and ultimately the Court did not agree. On July 31, 1996, Magistrate Judge Smith issued his recommended ruling denying plaintiffs' request for a preliminary injunction, finding, *inter alia*, that it was unlikely that plaintiffs would be successful in their argument that M.K. was legally entitled to be educated in the Putnam school system, or that his being provided an education at Harmony Hill somehow violates the IDEA. (Ruling on Plaintiffs' Motion for Preliminary Injunction dtd. 7/31/96 at 39.) On March 31, 1997, District Judge Chatigny approved and adopted Magistrate Judge Smith's Recommended Ruling over plaintiffs' objection.

M.K. remained at Harmony Hill for the rest of fifth grade and for all of sixth grade, until June 17, 1997. During the time that he was at Harmony Hill, Putnam developed educational programs for him and paid the educational costs[7] of his placement

---

[6] "Wrap-around" services are 24-hour per day services that are structured to permit a student to remain in a traditional educational environment. Judge Smith found that plaintiffs had provided no case authority requiring the provision of such services, nor had they advanced any persuasive arguments that they are required as a matter of law under the IDEA, § 504 of the Rehabilitation Act, the ADA, or the Fourteenth Amendment. (Ruling on Plaintiffs' Motion for Preliminary Injunction dtd. 7/31/96 at 40.)

[7] Plaintiffs deny that Putnam paid for all of the "educational costs," based in part of their assertion that all of the costs associated with this placement should be considered

at Harmony Hill.  Mrs. K. never requested a hearing to challenge the adequacy of the IEP offered at Harmony Hill.

On July 8, 1997, DCF withdrew the neglect petition, which had been pending in Juvenile Court.  On July 15, 1997, after fifteen months at Harmony Hill, M.K. was discharged home.  His behavior had improved significantly and weekends at home had gone well.  Upon his return home, DCF provided the family with six hours per week of respite care.

In September 1997, M.K. entered the seventh grade in the Putnam public schools.  Mrs. K. never requested a hearing to challenge the adequacy of the educational program Putnam had put in place for M.K. at this time.  Mrs. K. maintains that Putnam failed to provide all of the services that had been ordered by the hearing officer, including hiring a psychiatrist or other clinician to serve as an advisor to the PPT.

By November, M.K.'s situation had improved to the point that DCF discontinued its services.  Mrs. K. was told she could contact the Crisis Intervention Program if she needed help.

In January 1998, Mrs. K. twice called the police, who arrested M.K. for disorderly conduct.  He as taken to Day Kimball Hospital and then Natchaug Hospital.  On January 30, 1998, he returned home.  He attended public school until 2:00 p.m. each day and was then transported to the Joshua Center for therapy and

---

"educational."

other assistance.  He remained in the Joshua Center program until February 18, 1998.  On February 21, 1998, Mrs. K. again called the police because of M.K.'s disruptive behavior and he was again arrested.  On March 16, 1998, DCF re-opened a "protective services" case on M.K., and on March 24, 1998, at Mrs. K.'s request, a Juvenile Court judge ordered M.K. placed at Riverview for a 30-day evaluation.

On March 27, 1998, M.K. was admitted to Riverview.  While there, he again attended U.S.D. #2, for which Putnam paid the educational costs.[8]  M.K. was discharged on June 1, 1998. Because DCF no longer considered him to be at risk of abuse or neglect, he was no longer a "protective services" case.  Thus, he was transferred to the "voluntary services" program.  Upon his discharge from Riverview, M.K. was transferred by DCF to Connecticut Children's Place and then placed at Brightside for Families and Children, a residential school for children with disabilities in West Springfield, Massachusetts.  M.K. spent his eighth-grade year at Brightside, where he received special education services pursuant to an IEP developed by Putnam.  DCF paid the residential costs, while Putnam paid the costs of the educational component.  Plaintiffs never challenged the appropriateness or adequacy of the IEP while M.K. was at

_____

[8]  Plaintiffs again allege that Putnam did not pay all of the "educational" costs.  *See* Note 6, *supra.*

22

Brightside.[9]

At the end of M.K.'s eighth grade, on June 30, 1999, defendant John Shea's employment with Putnam ended. On August 2, 1999, defendant Patricia Shea became the Director of Student Services for Putnam. During her employment by Putnam, defendant Shea participated in all PPT meetings concerning M.K.

On August 18, 1999, M.K. moved from the Brightside residential facility to the Brightside Group Home. In September 1999, M.K. began ninth grade at West Springfield High School, where he received special education services as a student with serious emotional disturbances, pursuant to an IEP developed by Putnam. Putnam developed an IEP for M.K. for each year he attended West Springfield High School, and Putnam paid the educational costs of M.K.'s voluntary placement there. The adequacy of the IEP again was not challenged by Mrs. K. At this time, M.K. was living in a Brightside group home located on the grounds of Brightside. While in ninth grade, M.K. attended mainstream classes with 3.75 hours per week of support in a resource room. He passed all of his classes with "B" and "C" grades. Putnam paid the educational costs of M.K.'s program. Again, plaintiffs contest whether Putnam paid all "educational" costs associated with this placement.[10]

---

[9] *See* Notes 7 & 8, *supra.*

[10] *See* Notes 7 & 8, *supra.*

23

On September 13, 2000, M.K. was discharged from the group home and moved to a foster home in West Springfield. He entered tenth grade at West Springfield High School.  M.K. passed and received full credit for all of his classes, except Algebra which he dropped.  Plaintiffs did not challenge the adequacy of the IEP except to the extent that they contend that all of the services associated with this placement were "educational" for which Putnam should bear responsibility.  During this year, some problems developed in the foster home, which placed M.K. under a certain amount of stress.  In the summer of 2001, he moved into a new foster home.

In September 2001, he began the eleventh grade at West Springfield High School and passed all of his classes that year. The adequacy of the IEP was not challenged, except to the extent that plaintiffs claim that the transition services offered by Putnam during the 2001-02 and 2002-03 school years did not comport with the requirements of the IDEA.

At the conclusion of eleventh grade, a PPT was convened to conduct an annual review.  Based on the results of recent evaluations, the PPT concluded that M.K. could no longer be identified as a student with serious emotional disturbances and recommended that he be exited from special education for his senior year.  Mrs. K. objected and requested an independent educational evaluation by Dr. Thomas Kehle, to which Putnam

agreed.  As a result of her objection, the special education services previously provided to M.K. were continued.

On May 20, 2002, defendant Kline left the employ of Putnam, and on September 1, 2002, just as M.K. was beginning his senior year at West Springfield, JoAnn Messina took over as Director of Student Services.

M.K. began his senior year at West Springfield High school with the same special education services that had previously been provided to him.  On October 1, 2002, Dr. Kehle completed his evaluation of M.K., concluding that he continued to need special education and related services.[11]  A PPT was held on October 17, 2002, to review its previous determinations in light of Dr. Kehle's report.  The PPT did not accept Dr. Kehle's evaluation and determined that M.K. remained ineligible for special education services.

Sometime after the PPT meeting, M.K.'s performance began to deteriorate.  He failed to attend classes and failed to take some of his mid-term examinations.  In March, Ms. Messina attempted to

---

[11]  The Putnam defendants disagree with the results of his evaluation because of his failure to contact either the West Springfield school staff or his foster parents, his failure to review a recent psycho-educational assessment and recent psychological evaluation of M.K., and his failure to evaluate whether M.K. satisfied any of the criteria set forth in the State Department of Education's *Guidelines for Identifying and Educating Students with Serious* Emotional *Disturbance.*  Instead he relied solely on telephone interviews with Mrs. K., M.K., and on his historical records.

contact Mrs. K. to schedule a PPT meeting, but was unable to reach her.

On March 25, 2003, Mrs. K. requested a due process hearing to challenge the PPT decision to exit M.K. from special education services, to determine whether Putnam had provided appropriate transition services, and to ascertain whether Putnam was responsible for paying the costs of M.K.'s foster home placement, therapy, and mental health services, which plaintiffs contended were "educational" services.

M.K. finished his senior year by failing all of his courses, except for a collaborative computer repair course. He was eventually certified in computer repairs, making entry level work in that field possible. M.K. also passed the MCAS, an examination required by the Commonwealth of Massachusetts for graduation. He did not, however, graduate from West Springfield High School, because he had two outstanding graduation requirements, English and physical education.

On August 15, 2003, the Hearing Officer issued her decision in Case No. 03-087, finding, *inter alia*, that Putnam failed to provide M.K. with a FAPE. She found that Putnam failed to provide appropriate transition services that M.K. needed to move from high school to post-high school life. (Concl. of Law ¶ 8.) Specifically, she held that Putnam must provide medication management, ongoing therapy, and an independent consultant to

oversee the creation and implementation of an IEP that contains an appropriate transition plan and goals. (*Id.* at ¶ 11.) The Hearing Officer, however, refused to order Putnam to fund M.K.'s residential placement once DCF discontinued its funding because there was insufficient evidence that M.K.'s placement had been therapeutic in any way. (*Id.* at ¶¶ 14, 16.) She ordered Putnam to hire an independent consultant to oversee the creation and implementation of an IEP with an appropriate transition plan and goals, to pay for M.K.'s psychotherapy to be provided at least twice monthly, to pay for regular psychiatric supervision of M.K.'s medication regimen, and to provide transition services at least through the 2003-2004 school year. (Final Decision and Order ¶¶ 2-5, 7.) Based on the pattern of M.K.'s academic and behavioral difficulties, Putnam withdrew its challenge to M.K.'s eligibility for continued special education services and agreed that he was eligible under the category of SED, a student with serious emotional disturbances.

The parties agree that Putnam complied to the extent that it hired the independent consultant, Dr. Karan, who identified fifteen transitional goals that M.K. needed to accomplish. Putnam then developed an IEP with a transition plan, incorporating these goals, and agreed to provide M.K. with additional counseling (20 sessions) for a full school year.

On June 1, 2004, the PPT met and determined that M.K. had

accomplished nine of his ten independent living skills and all
five of his vocational skills.  Information submitted to the PPT
showed that M.K. had received an A+ certification in November
2003, and a Net+ certification in December 2003 from the
Computing Technology Industry Association for his competency as a
service technician in hardware and operating systems.

M.K. eventually completed his senior year at West
Springfield High School, meeting all of his academic goals and
requirements for graduation.  He attended graduation exercises on
June 6, 2004, but did not receive a diploma.  Although a diploma
has been prepared for him, Putman stated that it will not be
delivered to him until he is exited from his special education
program.

As of 2004, M.K. had moved from his foster home to an
apartment, supported by an independent living program and funded
by DCF, and was employed.[12]  He continued to attend therapy
sessions every two weeks and worked with a case worker on
planning and obtaining his weekly needs within a budget.  DCF
confirmed with Ms. Messina that M.K. had accomplished this goal.

_____

[12]  The Putnam defendants have supplemented the facts based
upon events that occurred after the filing of their original
motion.  Plaintiffs have objected to this supplemental filing.
The Court overrules their objection.  These supplemental facts
were necessary and critical to the Court's ruling on several of
the issues raised by the motion for summary judgment, including
the issue of mootness.  Moreover, plaintiffs had an opportunity
to respond and the Court has considered their response as well.

On November 1, 2004, M.K. successfully completed and was discharged from the Transitional Apartment Program which DCF provided to him through the Center for Human Development. On December 9, 2004, M.K. was discharged from the care of DCF.

At a PPT meeting held on December 9, 2004, Dr. Karan, the independent consultant, reported that M.K. had met the goals and objectives of the transition plan and, therefore, should be exited from special education. Ms. Messina agreed to contact West Springfield High School to authorize the release of M.K.'s diploma, which she subsequently did, and also authorized payment for four additional sessions of therapy between December 2004 and January 31, 2005. Based on Dr. Karan's determination, the PPT exited M.K. from the special education program. Although Mrs. K. did not agree with Dr. Karan's determination, she deferred to that decision.

Thus, M.K. has been discharged from DCF's care and exited from Putnam's special education services. As of 2005, he was employed and living entirely on his own in Springfield, Massachusetts.

Plaintiffs maintain that Putnam has not fully complied with the Hearing Officer's Order in that M.K.'s special education plan is still in effect as he has not achieved all of the goals and objectives of his IEP and Putnam has not paid for all of M.K.'s therapy and has not arranged for psychiatric services to manage

his medications.

***DISCUSSION***

Putnam has moved for summary judgment as to Counts II and V of plaintiffs' consolidated complaint and on its counterclaim on the following grounds:

(1) Plaintiffs' claims for continued community and in-school support services are moot based on M.K.'s completion of all the requirements for graduation from high school and Putnam's compliance with the Hearing Officer's Order;

(2) This Court lacks subject matter jurisdiction over any act or omission of the Putnam defendants that was not the subject of an administrative due process hearing;

(3) To the extent that plaintiffs have challenged the Hearing Officer's decisions, her decisions should be affirmed;

(4) The Putnam defendants are entitled to summary judgment on Count V, which seeks money damages, because there has been no violation of substantive law entitling plaintiffs to money damages and defendants Shea and Kline are protected by the doctrine of qualified immunity; and

(5) Putnam is entitled to summary judgment on its counterclaim that seeks reversal of that portion of the Hearing Officer's decision in Case No. 03-087 ordering Putnam to provide medical services to M.K. in the form of payment for psychiatric supervision of his medication regimen.

# _I. Mootness_

Initially, the Putnam defendants argue that plaintiffs' claims in paragraph five of their prayer for relief for "an array of support services . . . so that [M.K.] can continue to live in the community and attend public school" are now moot.  M.K., who is now 22 years of age, has graduated from high school and has been exited from special education after completing all of the transition goals set by the independent consultant.

Plaintiffs originally responded that M.K.'s transition services must continue until the independent consultant determined that it was appropriate to exit M.K. from special education.  However, since the filing of plaintiffs' response, the independent consultant has made that very determination and, on December 9, 2004, M.K. was exited from special education and the service of the Putnam defendants.

Moreover, M.K. is no longer covered by the IDEA.  The IDEA, 20 U.S.C. § 1412(a)(1)(A), applies to only persons between the ages of three and twenty-one, inclusive.  _St. Johnsbury Academy v. D.H._, 240 F.3d 163, 168-69 (2d Cir. 2001).  If, however, state law is more restrictive in terms of the individuals entitled to a free appropriate public education, state law will control.[13]

---

[13]  The IDEA provides that "[t]he obligation to make a free appropriate public education available to all children with disabilities does not apply with respect to children aged ... 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice."  20

Under Connecticut law, Conn. Gen. Stat. § 10-76d(b), M.K. was eligible for a free appropriate public education until he "graduate[d] from high school or reache[d] age twenty-one, whichever occur[ed] first." *See Lillbask v. State of Connecticut Dept. of Educ.*, 397 F.3d 77, 86 & n.5 (2d Cir. 2005). Because Connecticut law is more restrictive on this point than IDEA, it controls the term of M.K.'s eligibility for a FAPE. Thus, upon turning 21 or graduating from high school, M.K. was no longer eligible for a FAPE.

As this Court held in *Fetto v. Sergi*, 181 F. Supp. 2d 53, 66 (D. Conn. 2001) (Droney, J.), "[w]hereas standing is determined as of the time of the complaint, mootness is evaluated throughout the pendency of the litigation." In *Fetto*, the Court held that where the plaintiff had reached the age of 22 and was no longer eligible for special education services, his claims relating to certain "wrap-around" services were moot.[14] *Id.* at 67. Likewise, in this case, plaintiffs' claims for continued services[15] for M.K. are now moot.

---

U.S.C. § 1412(a)(1)(B)(i).

[14] The Court further held that the "capable of repetition, yet evading review" exception to the mootness requirement was not applicable to claims under the IDEA for injunctive relief. *Fetto*, 181 F. Supp. 2d at 67. The Court, however, did find that a live controversy existed as to the plaintiff's claims for compensatory educational services. *Id.* at 68.

[15] In paragraph 5 of their prayer for relief, plaintiffs asks the Court to order the Putnam defendants to provide an

## II. Lack of Subject Matter Jurisdiction

The Putnam defendants next ask this Court to dismiss those claims which were not the subject of a due process hearing based upon plaintiffs' failure to exhaust administrative remedies.

It is well-settled that before a party may bring an action in state or federal court for a violation of the IDEA, that party must first exhaust administrative remedies under the IDEA. 20 U.S.C. § 1415(l); *Polera v. Board of Educ. of Newburgh,* 288 F.3d 478, 483 (2d Cir. 2002). The IDEA's "carefully structured procedure for administrative remedies . . . encourages parents to seek relief at the time that a deficiency occurs and allows the educational system to bring its own expertise to bear in correcting its own mistakes." *Id.* at 486. "A plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction." *Id.* at 483; *see also A.E. v. Westport Board of Educ.*, 251 Fed. Appx. 685, 686 (2d Cir. 2007) (holding that plaintiffs waived their procedural challenges to the IEP meetings by failing to raise those challenges either prior to or during the due process hearing).

If a plaintiff is seeking relief that is also available under the IDEA, the plaintiff still must exhaust administrative remedies under the IDEA, regardless of whether the action is

appropriate array of support services in the community and school so that M.K. can continue to live in the community and attend public school. (Consol. Compl. at 44, ¶ 5.)

brought under the IDEA, the ADA, § 504 of the Rehabilitation Act, or § 1983. *Id.* (citing 20 U.S.C. § 1415(l)); *Cave v. East Meadow Union Free School Dist.*, 514 F.3d 240, 246 (2d Cir. 2008); *Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir. 1995); *Avoletta v. Town of Torrington*, No. 3:07cv841, 2008 WL 905882, at *6 (D. Conn. March 31, 2008); *DiStiso v. Town of Wolcott*, No. 3:05cv01910, 2006 WL 3355174, at *4 (D. Conn. Nov. 17, 2006).

Defendants assert that plaintiffs failed to exhaust their administrative remedies with respect to any IEP or other action taken by the Putnam defendants during M.K.'s fifth through eleventh grades. They point out that plaintiffs first requested a due process hearing on January 10, 1995, while M.K. was in fourth grade. The Hearing Officer issued her decision on February 20, 1996. The next due process hearing requested was on March 25, 2003, when M.K. was a senior at West Springfield High School and living in a foster home. Plaintiffs challenged the PPT's recommendation at its June 14, 2002 meeting to exit M.K. from special education services. The IEP at issue was M.K.'s May 11, 2001 IEP insofar as it applied to M.K.'s senior year.

Plaintiffs, citing this Court's January 6, 2003, ruling on their motion to amend, respond that once a plaintiff has properly exhausted his administrative remedies and filed a case in federal court, there is no need to re-exhaust as to subsequent IEP's.

While plaintiffs overstate this Court's prior holding,

defendants ignore the fact that much of the relief ordered by the Hearing Officer was prospective injunctive relief that would continue well beyond a single school year.  In ruling on plaintiffs' motion to amend, this Court did not hold that re-exhaustion is never required when a plaintiff is challenging a new IEP, as plaintiffs assert; nor did the Court hold that re-exhaustion is always required, as defendants appear to argue. Rather, the Court held that under the IDEA, a court is empowered to grant "appropriate relief," and where that "appropriate relief" includes injunctive relief extending beyond the school year at issue, re-exhaustion of administrative remedies is not required.  (Ruling on Pls.' Mot. to Amend at 3.)  However, the Court conditioned its granting of the motion to amend (which challenged Putnam's 2002 decision to exit M.K. from the special education program), on plaintiffs' active pursuit of administrative remedies regarding this decision.  (*Id.* at 4.)

With respect to the claims asserted against the Putnam defendants in the consolidated complaint, the only count possibly implicating an exhaustion requirement is Count V.  Count I is a claim for attorneys' fees and costs, and no further exhaustion of administrative remedies is required.  Count II challenges certain aspects of the Hearing Officer's decision, as to which there necessarily has been exhaustion.  Count V is brought under the IDEA, the ADA, § 504 of the Rehabilitation Act, and § 1983, and

asserts that the Putnam defendants violated these statutes by intentionally and in reckless disregard of plaintiffs' rights (a) establishing and implementing policies and procedures which ensured that M.K. could not receive the support he needed to be educated in the Putnam schools; and (b) refusing to authorize the PPT to make placement and program decisions after DCF placed M.K. with DCF-funded services. Both of these issues were addressed to some degree by the Hearing Officer in her first decision. To that extent, there has been an exhaustion of administrative remedies and the Court will consider them. However, to the extent that plaintiffs are challenging matters never addressed by the Hearing Officer, they will not be considered for there has been no administrative record developed.

Thus, the Court will not consider plaintiffs' claims set forth in paragraphs 103 through 107 of the consolidated complaint that, during M.K.'s eighth grade year, 1998-99, at Brightside, defendants failed to provide appropriate supplementary aids and services and intensive community services which they maintain would have allowed M.K. to leave Brightside and return to his home community. Plaintiffs also allege that M.K. did not receive an appropriate special education during his placement at Brightside because appropriate services were not provided in school and in the community, including but not limited to a community placement, mentoring, individual therapy, family

therapy, in-home behavior management, coordination of all aspects of M.K.'s program through a mutually acceptable independent consultant, medication management, psychiatric support, respite care, and crisis management services.  In paragraphs 108 and 109, plaintiffs complain about defendants'[16] failure to put in place the community and residential supports so that M.K. could be discharged to Putnam, rather than a group home in Springfield, Massachusetts.  Again, a due process hearing was never requested to challenge this placement or the failure to provide these services.  Mrs. K. never requested a due process hearing at any point while M.K. was at Brightside.  Therefore, these claims will not be considered by this Court.

The Court agrees with defendants that these particular challenged activities of defendants are sufficiently distinct and not part of any "appropriate relief" that could have been ordered by the Hearing Officer after the first hearing, so as to avoid the need for re-exhaustion.   Accordingly, the Court holds that it lacks jurisdiction over these particular claims due to plaintiffs' failure to exhaust their administrative remedies. *See Brennan v. Regional School Dist. No. 1 Bd. of Educ.*, 531 F. Supp. 2d 245, 263-64 (D. Conn. 2008) (dismissing parents' claims relating to school years subsequent to the filing of their administrative complaint for lack of exhaustion and finding them

---

[16]   Plaintiffs do not specify which defendants.

to be premature. "[T]he parents should instead have brought those claims in separate administrative proceedings.")

### III.  *The Hearing Officer's Decisions*

When a plaintiff challenges an administrative decision on the ground that the IEP denied a disabled child a FAPE, the Court must apply a two-part inquiry prescribed by the Supreme Court in *Rowley*, 458 U.S. at 206.  First, the Court must decide whether the school district complied with the IDEA's procedural requirement in developing the IEP.  Second, the Court must decide whether the IEP is "reasonably calculated to enable the child to receive educational benefits."  *Id.*  If the IEP fails to meet either prong, the school has failed to meet its statutory obligations under the IDEA to provide a FAPE.  *Cerra v. Pawling Central School Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).

While the standard of review is well-established, the parties disagree as to who shoulders the burden of proof on appeal.  Plaintiffs maintain that defendants bear the burden of proof, citing *Warton v. New Fairfield Board of Education*, 217 F. Supp. 2d 261, 271 (D. Conn. 2002) (Eginton, J.).  Defendants assert that the burden rests on plaintiffs, as the complaining parties, to prove that the Hearing Officer's decision was wrong, citing Judge Eginton's earlier decision in *Warton*, 125 F. Supp. 2d 22, 25 (D. Conn. 2000).  To the extent that these two opinions appear contradictory, as defendants point out, the earlier

decision referred to the burden of proof at this phase of the litigation, whereas the latter decision referred to the burden of proof at the due process hearing phase, where Judge Eginton found that the school district shouldered the burden of proof as to compliance with the IDEA and appropriateness of the placement. 217 F. Supp. 2d at 271.

Subsequent to these rulings, however, the Supreme Court handed down its decision in *Schaffer v. Weast*, 546 U.S. 49, 61 (2005), which held that in an administrative proceeding challenging an IEP, the burden of proof is on the party seeking relief, which in this case would be plaintiffs. *See also Gagliardo v. Arlington Central School Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (holding that the party who commences the impartial due process hearing bears the burden of persuasion)*; M.H. v. Monroe-Woodbury Cent. School Dist.*, 250 Fed. Appx. 428, 430 (2d Cir. 2007); *Cabouli v. Chappaqua Central School Dist.*, 202 Fed. Appx. 519, 521 (2d Cir. 2006). There has been some disagreement in this District as to whether the "general default rule" of *Schaffer* overrides state law to the contrary. In *Brennan*, 531 F. Supp. 2d at 267, for example, Judge Hall stated that it was not clear whether this general rule, set forth in *Schaffer*, applied when state law specifically allocated the burden of proof to the school district. She found that Connecticut falls into "this grey area" (*see* Conn. Agencies Regs.

§ 10-76h-14(a) (stating that in a due process hearing the public agency has the burden of proving the appropriateness of the child's placement or program)), and adopted the rationale of Justice Breyer's dissent in *Schaffer*, 546 U.S. at 67-71, that the IDEA's model of cooperative federalism was not intended to preempt a state's ability to allocate the burden of proof. Accordingly, she found that the school district bore the burden of proving the appropriateness of its IEPs by a preponderance of the evidence. Nevertheless, she concluded that under Connecticut law, the parents bore the burden of persuasion, that is, coming forward with the evidence to support their claim that the school district denied their child a FAPE during a given period. *Id.*; *see also A.E. v. Westport Board of Educ.*, 463 F. Supp. 2d at 218 n.2 (citing the default rule of *Schaffer*, and noting that the Supreme Court had specifically declined to decide whether states could override this and put the burden on the school district regardless of who initiated the proceedings). The Second Circuit has not yet addressed this issue. *Id.*

This Court finds, as did Judge Hall in *Brennan*, that plaintiffs, as the parties challenging the adequacy of the IEPs, at least bore the initial burden of persuasion. To hold otherwise would render every IEP presumptively invalid until the school board proved its validity. Moreover, in ruling on plaintiffs' challenges to the Hearing Officer's decision, as

40

discussed above, the Court is mindful that its review of the administrative record is "strictly limited," and that "due weight" must be given to the findings of the Hearing Officer, who has more specialized knowledge and experience with educational issues.[17]  *See Walczak*, 142 F.3d at 129.  The Second Circuit has held that "[t]o avoid impermissibly meddling in state educational methodology, a district court must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan."  *Cerra,* 427 F.3d at 195 (internal citations and quotation marks omitted).  The IDEA does not require a school district to furnish every service necessary to maximize a child's educational potential.  *Rowley*, 458 U.S. at 197 n.21.  Rather, the IDEA is satisfied if the school district provides an IEP that is "likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement."  *Cerra,* 427 F.3d at 195 (internal citations and quotation marks omitted).

Applying these standards, the Court turns to plaintiffs' specific challenges to those aspects of the Hearing Officer's decisions that implicate the Putnam defendants.

---

[17]  As the Second Circuit cautioned in *Cerra*, it has "not hesitated to vacate district court opinions where the district court erred in substituting its judgment for that of the agency experts and the hearing officer."  427 F.3d at 195 (internal citations and quotation marks omitted).

### *A. The Hearing Officer's Decision in Case No. 03-087*

Plaintiffs' challenges to the Hearing Officer's decision in Case No. 03-087, insofar as they pertain to the Putnam defendants, are set forth in paragraphs 126a, 126b, 126c, 126e, and 126f of the Consolidated Complaint.

#### *1. Paragraph 126a*

In paragraph 126a, plaintiffs allege that the Hearing Officer's decision was erroneous to the extent that she failed to find that funding of M.K.'s therapeutic foster placement was necessary to enable M.K. to receive an appropriate special education and failed to order Putnam and/or DCF to continue funding for that placement until M.K.'s eligibility for special education expires. The Putnam defendants argue that M.K.'s foster placement was not "therapeutic" and was not necessary for him to receive a FAPE.

As the Hearing Officer correctly held, a school district may be held liable for the full cost of a residential placement when a "residential placement is necessary to provide special education and related services to a child with a disability." 34 C.F.R. § 300.104. In *Mrs. B. v. Milford Board of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997), the Second Circuit held that the critical issue in determining whether a school district must fund a residential placement, is "whether the child requires the residential placement to receive educational benefit." The Court

42

held that, once it was determined that the residential placement was necessary for the child's educational progress, the LEA was responsible for funding the placement, even though the child had been placed there for non-educational reasons. *Id.; see also M.C. v. Voluntown Board of Educ.*, 56 F. Supp. 2d 243 248 (D. Conn. 1999) (holding that the converse of the foregoing statement is also true – that without a residential placement, the child would not make educational progress). Thus, in *Naugatuck Board of Education v. Mrs. D.*, 10 F. Supp. 2d 170, 181 (D. Conn. 1998), this Court held that where a child's "residential placement was a *necessary* component of his special education instruction," the LEA was responsible for the cost of that placement.

In this case, the Hearing Officer found that, although M.K.'s emotional and educational needs were intertwined, there was no evidence that these needs could only be addressed through a residential placement. (Concl. of Law ¶ 14.) She noted that most residential placements are made when a student requires a highly structured setting with integrated educational and residential programs that allow therapeutic, educational and behavior strategies to be constantly implemented across educational and residential components. Those needs, she found, did not exist in M.K.'s case, and she noted that he had made progress "despite his placement." *Id.* She held that nothing suggested that M.K.'s foster home was "therapeutic" in any way.

Testimony from the independent consultant, the psychiatrist, and Mrs. K. confirmed that M.K. had almost total independence in the foster home.  He lived in his own section of the house, had few chores, and was free to come and go as he wished.  There was no evidence that he received any support services through the foster home.  Respite and 24-hour on-call emergency services were available to the foster parents, but there was no evidence that these services had ever been used or were necessary.  The main benefit of the foster placement, the Hearing Officer determined, was that M.K. was not in his mother's house.  *Id.*  She concluded that "the fact that neither one is currently interested in living together again (and choose not to participate in family therapy) is not sufficient reason to order the school district to fund the Student's foster placement.  This is especially true where there is insufficient evidence that the placement has been therapeutic in any way."  *Id.* at ¶ 15.

Plaintiffs argue that the case of *Mrs. B. v. Milford Board of Education*, 103 F.3d 1114 (2d Cir. 1997), controls the Court's decision on this issue and requires that the Hearing Officer's decision be overturned.  *Mrs. B.*, however, is distinguishable on its facts.  In that case, the child was placed in a residential setting because her behavior problems were causing her family and teachers frustration, she needed structure, consistent limits and expectations, and she was not progressing in the special

44

education program.  In virtually all of her classes, she failed
to meet basic academic and behavioral standards.  *Id.* at 1117.
Her residential placement provided a "highly structured setting."
*Id.* at 1120.  "The evidence show[ed] that [the child's] behavior
was regressing, and that her failure to advance academically was
due primarily to her severe emotional problems, which could not
be effectively dealt with outside a residential setting. . . .
Accordingly, the defendants were obligated to pay for the entire
cost of the residential placement."  *Id.* at 1122.

    Here, in contrast, M.K. was initially placed in a foster
home at Mrs. K.'s request because of his behavior at home,
despite the fact that he was making satisfactory academic
progress.  Subsequently, he was admitted to Harmony Hill as part
of DCF's Voluntary Services Program and with the consent of Mrs.
K.  There is nothing in the record to suggest that this
residential placement was necessary because M.K. was unable to
make academic progress without this placement.  His next
admission to a residential setting was again through DCF's
Voluntary Services Program at Connecticut Children's Place and
then at Brightside in West Springfield.  Again, there is no
evidence that this placement was required due to a lack of
academic progress.  After ninth grade, M.K. was moved into a
foster home, and the next year into a different foster home.
Although plaintiffs' counsel referred to the foster home

placement as "therapeutic" throughout his questioning of the

expert witnesses at the due process hearing, Dr. Kehle testified

that is was not "therapeutic," that it was not a learning

experience for him.[18]  Both Dr. Kehle and Mr. Maloney[19] testified

---

[18]  Dr. Thomas Kehle testified, "the situation he's in now, although he enjoys it, is not therapeutic for him." (Hr'g Tr. 4/21/03 at 81.)  Dr. Kehle reiterated his belief that the foster arrangement was not "therapeutic" in response to cross-examination and explained that it was not a learning experience that would enable M.K. to move more closely to a normal living situation.  *Id.* at 84.  He described the foster parents as "*laissez-faire,*" allowing M.K. free rein to do whatever he wanted to.  *Id.* at 115.  M.K. had no chores; he came and went as he pleased; there was very little supportive restriction.  *Id.* at 115-16.  Dr. Kehle testified that M.K. was placed in a foster home primarily because of his outbursts and abuse by his natural father.  M.K. could not live at home because, in his opinion, within a relatively brief period of time "there would be a huge explosion."  *Id.* at 116-17.  He did not think the home environment was a good situation for M.K. or that he would go back there voluntarily.  *Id.* at 119.

[19]  John Maloney, M.K.'s therapist since September of 2000 and a mental health clinician for Child and Family Services in West Springfield, did testify that, in his opinion, M.K.'s foster placement was necessary for him to receive an education and participate in transition planning, and that if the foster placement and therapy were to be terminated, he did not think M.K. would be motivated to complete high school. (Hr'g Tr. 6/20/03 at 19.)  Mr. Maloney considered the foster home a "therapeutic" placement based on his belief that the foster parents had received special training to deal with children at risk.  *Id.* at 33.  However, he clarified that the foster parents themselves were not doing much in a therapeutic way, but the support services around the foster home made it therapeutic.  *Id.* at 34-35.  He said that M.K. had a fair amount of independence in the house – that he could come and go as he pleased and that he was "out to all hours of the night."  *Id.*  He also testified that he did not believe that M.K. could return home because the family dynamics were such that he and his mother could not get along for long periods of time and neither was willing to make the investment that it would take to make it successful.  *Id.* at 35, 37.

to M.K.'s independence in the foster home, the lack of structure, that M.K. had "free rein" and could come and go as he pleased. There was no evidence that M.K. received any support services through the foster placement.  Both were of the opinion that he could not live at home because of the dynamics between him and his parents.  Further, Mr. Maloney testified that his lack of success at school his senior year was due to his feeling overwhelmed about the changes that were about to take place and that he "deliberately sabotaged" his senior year.

The Second Circuit in *Walczak*, 142 F.3d at 131-32, distinguished *Mrs. B.* on similar grounds and cited to cases from other circuits have required similar objective evidence of a child's regression in a day program before finding a residential placement to be required by IDEA.  *See, e.g., Seattle School Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1497 (9th Cir. 1996) (finding that where the child's assaultive behavior problems had escalated to the point of the child's requiring restraints, a period of hospitalization, and ultimately expulsion from the school's day program, such that no educational services were provided for six months, the hearing officer and district court properly ordered residential placement); *M.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 392 (3d Cir.) (holding that where objective evidence indicated that sixteen-year old had regressed in day program from a point where he had been able to dress and feed himself

independently to a point where he could no longer do so, residential placement was plainly required), *cert. denied,* 519 U.S. 866 (1996); *Abrahamson v. Hershman*, 701 F.2d 223, 224-25 (1st Cir. 1983) (finding that a child who "would not respond to his name, did not seem to understand anything at all, and had to be locked into the classroom to prevent him from running off" could not be educated in a day program but required a residential placement).

As the Hearing Officer found, M.K.'s educational needs did not dictate his residential placement. After reviewing the administrative record, the Court upholds the Hearing Officer's decision that M.K. did not require a foster home placement in order to make educational progress. The fact that his emotional and educational needs were intertwined does not lead to the inescapable conclusion that a residential foster placement was necessary to address his educational needs. Therefore, the Court finds that it was not a "related service" within the meaning of the IDEA, and Putnam is not responsible for the costs of this foster care. The Court upholds the Hearing Officer's finding that Putnam was not required to pay for the foster placement.

### 2. *Paragraph 126b*

Plaintiffs next assert that the Hearing Officer erred in Case No. 03-087 in holding that "requiring the parent and M.K. to reimburse the State for DCF-funded residential placements and

program costs [was] not inconsistent with the Putnam Board of Education's responsibility to provide a free appropriate public education."  (Consol. Compl. ¶ 126b.)

This claim misconstrues the Hearing Officer's finding.

> The parent has requested that the hearing officer order the school district to "hold the parent and [Student] harmless from any claim asserted by the State of Connecticut for residential, therapeutic, psychiatric and case management services provided through DCF funding during the two-year period ending on October 17, 2002, when the PPT meeting that gave rise to this dispute was held." Currently, there is no outstanding bill owed by the parent and/or Student to the State of Connecticut.  Such a bill would come due only if the family received some windfall and even then only partial repayment would be expected. . . . Therefore, there is no way to calculate such a bill or determine when it might come due.  It would not be reasonable to order the school district to hold the family harmless with regard to a claim that might never be made, or could be made but at some distant, unknown date in the future.  In addition, no statutory authority has been cited that would give a due process hearing officer justification to require a school district to hold a family harmless from a claim asserted by the State of Connecticut on behalf of DCF.

(Order No. 03-087, Findings of Fact ¶ 19.)

Initially, the Court notes that Putnam is only responsible for the reasonable costs of M.K.'s special education and related services.  The Court has already found that the residential placements were not related services for which Putnam would be held responsible.  Therefore, Putnam would not be responsible

for the non-educational costs of M.K.'s residential placements.

Plaintiffs have also failed to cite any authority that would give a hearing officer in a due process hearing under the IDEA jurisdiction or authority to require an LEA to hold a family harmless from a claim or lien asserted by DCF.  *See* Conn. Gen. Stat. § 10-76h(d)(1).

Moreover, just as the Court held in ruling on DCF's motion for summary judgment, this issue is not ripe for adjudication, as no lien has been asserted,[20] and the Court will not provide an advisory ruling on something that had not happened.  The Court finds no error with respect to the Hearing Officer's finding in this regard and grants summary judgment in favor of Putnam on this issue.

### 3. *Paragraph 126c*

In paragraph 126c, plaintiffs challenge the Hearing Officer's determination that she had no jurisdiction to determine whether Putnam or plaintiffs are responsible for past and future DCF-funded services that are necessary to enable M.K. to receive

---

[20]  Sonji Fonseca, an employee with the Connecticut Department of Administrative Services who oversaw billing collection for programs including DCF, testified that there were no outstanding bills to Mrs. K. or M.K.  She said that the State would look to recover the amounts paid by DCF on behalf of M.K. only if either M.K. or Mrs. K. came into a windfall of money, such as from the lottery or winning a lawsuit or an inheritance, or if they left an estate at their death.  (Hr'g Tr. 6/6/03 at 70-75.)  The State does not look to their salaries or savings to recover this money.  *Id.* at 73.

an appropriate education.  For the reasons set forth above, the
Court finds no error and upholds the Hearing Officer's decision
in this regard.

### *4.  Paragraph 126e*

In paragraph 126e, plaintiffs assert that the Hearing
Officer erred in finding that M.K. had achieved an A++
certification in computer repair and maintenance.   All parties
agree that M.K. had not actually received his A++ certification
at the time of the hearing, although there was evidence that he
had passed the computer repair course required for this
certification.  However, he did subsequently receive this
certification.  Therefore, to the extent that the Hearing
Officer's finding was not technically correct, it was harmless
error.

### *5.  Paragraph 126f*

Plaintiffs' last challenge to the Hearing Officer's decision
in Case No. 03-086 is to her finding that she lacked jurisdiction
to require a school district to hold Mrs. K. and M.K. harmless
from a claim and/or lien asserted by the State for DCF-funded
services that were necessary to provide M.K. with an appropriate
special education program was contrary to the IDEA's requirement
that children with disabilities receive a *free* special education.

For the reasons set forth above, the Court finds no error
and grants summary judgment in favor of Putnam on this claim

## B. *The Hearing Officer's Decision in Case No. 95-353*

Plaintiffs have also challenged certain aspects of the Hearing Officer's decision in Case No. 95-353.  The sections that pertain to the Putnam defendants are set forth below.

### *1. Paragraph 127a*

In paragraph 127a, plaintiffs assert that the Hearing Officer failed to properly apply the standards articulated by the Court in *Mrs. B. v. Milford Board of Education*, 103 F.3d 1114 (D. Conn. 1997),[21] to determine whether Putnam was obligated to pay for in-home, community-based and residential support services including, but not limited to, behavior management services, psychiatric services, crisis support, mentoring, individual therapy for M.K., family therapy, medication monitoring, coordination of services through a mutually acceptable independent consultant, and in-patient residential services paid for by DCF.  Relying on the Second Circuit's decision in *Mrs. B.,* that an appropriate education is provided "if personalized instruction is being provided with sufficient supportive services to permit a child to benefit from the instruction,"  103 F.2d at 1122 (citing *Rowley*, 458 U.S. at 189), plaintiffs maintain that the IDEA contemplates that support services, such as residential placements, are necessary for a child to receive a FAPE.

_____

[21]  The decision in *Mrs. B.* was handed down a year after the Hearing Officer's decision in Case No. 95-353.

According to plaintiffs, the Hearing Officer erred by failing to apply this standard, as well as by limiting her consideration of "related services" to those listed in the regulations, 34 C.F.R. § 300.24 (formerly 34 C.F.R. § 300.16(12)(iii)).

The Putnam defendants maintain that the Hearing Officer correctly focused on whether "appropriate services [had] been provided to keep a child in regular education," (Case No. 95-353, Concl. of Law ¶ 17), not whether services had been provided to keep a child in the home and therefore in the local schools, as plaintiffs urge.

The Hearing Officer held that while most "related services" would be considered "wrap around" services, not all "wrap around" services could be considered "related services" for special education purposes under the IDEA. (*Id.* at ¶ 12.) "Therefore, the set of services that M. may need to be maintained at home, may not be the same set of services to which he is entitled under special education law." (*Id.*) She found that while M.K. had made academic progress, he had not been provided the services he needed to be consistently maintained in the least restrictive environment. (*Id.* at ¶ 16.) Thus, she found that many of the support services requested by plaintiffs were "related services," including in-home behavior management (*id.* at ¶ 7), parent counseling and/or training (*id.* at ¶ 8), ongoing consultation to the PPT regarding medication management, clinical and therapeutic

needs (*id.* at ¶ 10; Dec. & Order at ¶ 4); an educational

consultant (Dec. & Order at ¶ 5); and a full-time

paraprofessional assigned to M.K.'s classroom to provide behavior

support (*id.* at ¶ 6).  On the other hand, she found that other

requested services were not "related services" under the IDEA: a

twenty-four hour crisis plan with an on-call person for in-home

support; respite care for the family; and an in-home mentor.

(Concl. of Law at ¶ 23).

The Court has already found that a residential placement was

not a related service and has distinguished *Mrs. B.* in that

regard and, thus, will not revisit this issue.

The IDEA, 20 U.S.C. § 1401(26), defines "related services"

as:

> transportation, and such developmental,
> corrective, and other supportive services
> (including speech-language pathology and
> audiology services, interpreting services,
> psychological services, physical and
> occupational therapy, recreation, including
> therapeutic recreation, social work services,
> school nurse services designed to enable a
> child with a disability to receive a free
> appropriate public education as described in
> the individualized education program of the
> child, counseling services, including
> rehabilitation counseling, orientation and
> mobility services, and medical services,
> except that such medical services shall be
> for diagnostic and evaluation purposes only)
> *as may be required to assist a child with a*
> *disability to benefit from special education*,
> and includes the early identification and
> assessment of disabling conditions in
> children.

(Emphasis added).  Thus, the IDEA specifically limits "related services" to those which "may be required to assist a child with a disability to benefit from special education."  This is the standard applied by the Courts in *Rowley* and *Mrs. B.,* and this is the standard applied by the Hearing Officer.  In deciding whether a school must provided a certain support service, the Court must determine whether the child requires that support service in order to receive educational benefit.  *Mrs. B.*, 103 F.3d at 1122 (citing *Rowley*, 458 U.S. at 197-98).  This is the standard that the Hearing Officer applied, the Court finds no error in her finding that a twenty-four hour crisis plan with an on-call person for in-home support; respite care for the family; and an in-home mentor were not "related services" under the IDEA.

### 2.  *Paragraph 127b*

Plaintiffs also assert that the Hearing Officer failed to find that the following in-home, community-based and residential support services, including but not limited to, behavior management services, psychiatric services, crisis support, mentoring, individual therapy for M.K., family therapy, medication management, coordination of services through a mutually acceptable independent consultant, and in-patient residential services, were necessary to enable M.K. to receive an appropriate special education program.

As the Supreme Court held in *Rowley*, 458 U.S. at 197 n.21,

The IDEA does not require states to maximize the potential of handicapped children.  The purpose of the Act was "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."

The record reflects that M.K. made academic progress without these services being provided.  While the requested services might have eased Mrs. K.'s burden in raising M.K., that fact alone does not require the school district to provide these services.  The Court finds that no error in the Hearing Officer's conclusion that twenty-four hour crisis management with an on-call person for in-home support, respite care for the family, and an in-home mentor were not related services under the IDEA.

### 3.  *Paragraph 127c*

Lastly, plaintiffs argue that the Hearing Officer erred by finding that she lacked the authority to order DCF and Putnam to work cooperatively to develop and implement services for M.K. and to require that placements for educational reasons be made by the PPT and not the DCF Treatment Team.[22]

In ruling on defendant Sergi's motion for summary judgment, this Court previously held that a due process hearing officer lacks jurisdiction over non-educational state or local agencies,

---

[22]  The remaining claims in paragraph 127c do not pertain to the Putnam defendants.

such as DCF, except to the limited extent that they are acting as the LEA.  Thus, the Court upholds the Hearing Officer's decision that she did not have jurisdiction to order DCF to work with Putnam to develop services for M.K.

With respect to her finding that the PPT should have made decisions concerning M.K.'s placement, the record reflects that although the residential placement decisions were made by the State Juvenile Court, Mrs. K., and DCF, Putnam did, in fact, make decisions about M.K.'s educational programming while he was in a residential placement, except when DCF was acting as his LEA, while M.K. was in U.S.D. # 2.  In fact, Putnam funded all of M.K.'s educational programs while he was in residential placements, other than when he was attending school at U.S.D. # 2.  Had the PPT considered a residential placement necessary for M.K. to benefit from his education, the PPT should have been involved in the decision-making process.  But, as the Court has already held, the residential placements were for reasons other than educational benefit and, therefore, were not the responsibility of Putnam.  The Court upholds the Hearing Officer's decision.

## IV.  *Count V*

Defendants' next argument relates solely to Count V.  They claim that defendants Shea and Kline are protected against a claim for money damages by qualified immunity, and as to Putnam,

they assert that there has been no violation of substantive law.

The fifth count seeks damages from Putnam, Shea, and Kline under the ADA, § 504 of the Rehabilitation Act, the IDEA, and 42 U.S.C. § 1983 for their intentional and reckless disregard of plaintiffs' rights by (1) their alleged establishment and implementation of policies and procedures which ensured that M.K. could not received the support he needed to be educated in the Putnam schools; and (2) their alleged refusal to authorize the Putnam PPT to make placement or program decisions after DCF placed M.K. with DCF-funded services. As plaintiffs explain in their opposition brief, this count is challenging the Putnam defendants' failure to put in place a mechanism to allow the PPTs to consider whether M.K.'s placements and support services were educational in nature and also to ensure that M.K. would receive the necessary support services to allow him to return to the Putnam public schools to receive a FAPE in the least restrictive environment.

It is not clear what time span this count is addressing. M.K.'s first residential placement occurred in September 1995, when M.K. was placed at Riverview by order of the Juvenile Court. M.K. was at Riverview at the time the Hearing Officer issued her first decision in February 1996 in Case No. 95-353, in which she found that DCF's determination to place a child outside the home and the Juvenile Court's decision to commit a child to DCF were

matters over which Putnam had no control.  She found that Putnam had never excluded M.K. from its schools nor was it proposing to do so.  "It has always provided a placement for M. when he was able to attend their school (both when he was at home and during his foster placement)."  (Concl. of Law ¶ 18.)  Plaintiffs have not challenged this finding.

M.K. remained at Riverview until April 1996, when DCF transferred him to Harmony Hill.  From September 1997 to March 1998, he lived at home and attended the Putnam schools.  On March 27, 1998, he was again admitted to Riverview by court order, where he remained until his placement at Brightside on July 1, 1998.  To the extent that plaintiffs are challenging conduct of the Putnam defendants during this period, this Court has already held that it does not have jurisdiction over these claims (Consol. Compl. ¶¶ 103-109) due to plaintiffs' failure to exhaust administrative remedies.

To the extent that this count relates to M.K.'s placement in various foster homes in West Springfield during his high school years, plaintiffs concede in their opposition brief that by September 1999, M.K. concluded that he could not return home "given his track record there and his perception that most people in Putnam viewed him as different."  (Pls.' Mem. in Opp'n to Mot. for Summ. Judgment at 55.)  The Hearing Officer's findings support this conclusion.  She found that during the summer of

2000, as problems developed within his foster home and M.K.'s grades began to slide, DCF wanted him to return home at the end of ths school year, but M.K. was "adamantly opposed" to leaving West Springfield and returning to Putnam. (Findings of Fact ¶ 6.) Thus, even assuming that Putnam had failed to put in place the necessary support services to allow M.K. to return to the Putnam schools, this alleged violation of the IDEA could not be the proximate cause of any harm suffered by M.K., since M.K. was unwilling to return home from his residential placement in West Springfield.[23] Therefore, the Court finds that plaintiffs have failed to establish an actionable § 1983 claim for defendants' violation of the IDEA. Having found no violation of § 1983, the Court need not address defendants' qualified immunity argument.

Additionally, for the reasons set forth in its ruling on the DCF defendants' motion for summary judgment, the Court finds no evidence to support a claim of discrimination under Title II of the ADA or § 504 of the Rehabilitation Act. Like the plaintiffs in *Doe v. Pfrommer*, 148 F.3d 73 (2d Cir. 1998), plaintiffs are attempting to invoke the anti-discrimination provisions of the ADA and the Rehabilitation Act to challenge the adequacy of the services provided by the Putnam defendants, not illegal disability discrimination. As the Supreme Court specifically

---

[23] Money damages are not directly recoverable under the IDEA. However, money damages may be recovered under 42 U.S.C. § 1983 for violations of the IDEA. *Polera*, 288 F.3d at 486.

noted in *Olmstead v. L.C.*, 527 U.S. 581 (1999), the ADA does not impose on the States a standard of care for whatever services they provide to the disabled nor does it require the States to "provide a certain level of benefits to individuals with disabilities." 527 U.S. at 603 n.14.  Yet, this is precisely what plaintiffs are challenging in this case - the level of benefits provided by the Putnam defendants to M.K.  Such a claim is not cognizable under the anti-discrimination provisions of either the ADA or § 504.  As the Second Circuit held in  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003)*,* there must be something different about the way M.K. was treated because of his disability.  It is this comparative component that is wholly lacking from plaintiffs' discrimination claims.

Moreover, there is no individual liability for money damages under Title II of the ADA or § 504 of the Rehabilitation Act. *See S.W. v. Warren*, 528 F. Supp. 2d 282, 297 (S.D.N.Y. 2007) (dismissing all § 504 and IDEA claims against individual defendant); *Atkins v. County of Orange*, 251 F. Supp. 2d 1225, 1233 (S.D.N.Y. 2003) (holding that individuals may not be sued for violations of Title II of the ADA); *Harnett v. Fielding Graduate Institute*, 400 F. Supp. 2d 570, 575 (S.D.N.Y. 2005) (holding that individuals may not be held personally liable for violations of the ADA or Rehabilitation Act), *aff'd*, 198 Fed. Appx. 89 (2d Cir. 2006); *Menes v. CUNY Univ. of N.Y.*, 92 F. Supp.

2d 294, 306 (S.D.N.Y. 2000)(holding that ADA and Rehabilitation
Act claims may not be asserted against individuals either in
their personal or official capacity); *Harris v. Mills*, 478 F.
Supp. 2d 544, 547-48 (S.D.N.Y. 2007) (holding that ADA and
Rehabilitation Act claims may not be asserted against
individuals); *but see Johnson v. New York Hospital*, 897 F. Supp.
83, 85-86 (S.D.N.Y. 1995) (allowing § 504 claim against
individuals who were responsible for the discriminatory
decisions), *aff'd on other grounds,* 96 F.3d 33 (2d Cir. 1996);
*Scruggs v. Meriden Bd. of Educ.*, No. 3:03cv2224, 2005 WL 2072312,
at *10 (D. Conn. Aug. 26, 2005) (allowing Rehabilitation Act
claim against a defendant with authority to accept federal
funding), *vacated in part on reconsideration,* 2006 WL 2715388 (D.
Conn. Sept. 22, 2006).

Thus, the Court finds that the Putnam defendants are
entitled to summary judgment on plaintiffs' claims set forth in
count five.

### V.  *Putnam's Counterclaim*

Lastly, Putnam seeks summary judgment in its favor on its
counterclaim, wherein it challenged the Hearing Officer's
Decision in Case No. 03-087 that Putnam was required to "pay for
psychiatric supervision to appropriately manage [M.K.'s]
medication regime.  The psychiatrist is to be mutually agreed
upon by the family and the PPT.  The psychiatric appointments are

to occur on a regular basis, the frequency of which is to be determined by the psychiatrist." (Final Decision & Order at 15 ¶ 5.)

Putnam's argument is very straight forward. The only medical services that are considered "related services" under the IDEA and those for diagnostic and evaluation purposes only. 20 U.S.C. § 1401(22); 34 C.F.R. § 300.34. A psychiatrist is a physician, and thus his services are "medical services." *Cedar Rapids Community School Dist. v. Garret F.*, 526 U.S. 66, 74 (1999). Although supervision of M.K.'s medication regime is a medical service, it is not a "related service" under the IDEA for which Putnam should be held responsible because it is not being provided for the purpose of diagnosis or evaluation.

Plaintiffs respond that these medical services were being provided for diagnostic and evaluation purposes and should be considered "related services." At the time the Hearing Officer entered her decision, M.K. was taking medication and the psychiatrist's role was primarily to monitor the side effects of the medication. Therefore, his services should be considered as evaluative services.

Putnam replies that M.K.'s disability had already been diagnosed and evaluated. The sole purpose of the psychiatrist was to monitor and prescribe M.K.'s medication, which is clearly a medical service and nothing more.

The IDEA defines "related services" as

> transportation, and such developmental,
> corrective, and other supportive services
> (including speech-language pathology and
> audiology services, psychological services,
> physical and occupational therapy,
> recreation, including therapeutic recreation,
> social work services, counseling services,
> including rehabilitation counseling,
> orientation and mobility services, and
> *medical services, except that such medical*
> *services shall be for diagnostic and*
> *evaluation purposes only)* as my be required
> to assist a child with a disability to
> benefit from special education, and includes
> the early identification and assessment of
> disabling conditions in children.

20 U.S.C. § 1401(22) (emphasis added). The Regulations, 34

C.F.R. § 300.34(c)(5), then define "medical services" as

"services provided by a licensed physician to determine a child's

medically related disability that results in the child's need for

special education and related services." In *Irving Independent*

*School Dist. v. Tatro*, 468 U.S. 883, 892-94 (1984), the Supreme

Court held that this regulation was a reasonable interpretation

of the IDEA and, thus, this Court must defer to the regulation in

deciding whether the services at issue were "medical service." A

psychiatrist is a physician, and, under the Regulations, the

services he provides would be considered "medical services." *See*

*Cedar Rapids Community School Dist.*, 526 U.S. at 73-74 (citing

*Tatro,* 468 U.S. at 892-94); *Morton Community Unit School Dist.*

*No. 709 v. J.M.*, 986 F. Supp. 1112, 1122 (N.D. Ill. 1997), *aff'd*,

152 F.3d 583 (7th Cir. 1998), *cert. denied*, 526 U.S. 1004 (1999).

However, it is well-settled that the phrase "medical services" "does not embrace all forms of care that might loosely be described as 'medical' in other contexts, such as a claim for income tax deduction." *Cedar Rapids Community School Dist.*, 526 U.S. at 75. Thus, the issue is whether the medication monitoring services ordered by the Hearing Officer were for diagnostic and evaluation purposes. If so, they are "related services" for which Putnam bears financial responsibility; if not, Putnam is not responsible for these services.

At the time of the hearing, M.K.'s medically related disability had long since been diagnosed. He was taking Wellbutrin and Adderall, and DCF was providing medication management through a contract with the Tri-County Youth Programs. (The record does not indicate whether the medication management was being provided by a psychiatrist or some other health care provider.) At the request of the West Springfield school district, a psychological evaluation had been performed by a licensed clinical psychologist, Dr. Meredith McCarran, who recommended, *inter alia*, continuation of M.K.'s psychological counseling and medication regime. Mr. Maloney, M.K.'s therapist, also believed it was crucial that he receive transition services, most importantly counseling and medication management.

The Hearing Officer found that, in terms of transition services that M.K. needed to move toward his life post-high

school, it was "imperative that [his] medication regime is continued; medication management requires psychiatric support." (Concl. of Law ¶ 11.)  She also found that ongoing therapy was essential and suggested family therapy as well, although she noted that neither M.K. nor his mother seemed willing to participate.  (*Id.*)  Because DCF would cease all funding for these services when M.K. reached the age of 18, the Hearing Officer found that the school district must pay for these services, which were "transition services which are properly the responsibility of a school district."  (*Id.* at ¶ 18.)  She then ordered Putnam to pay for M.K.'s transition services, including "psychiatric supervision to appropriately manage the Student's medication regimen."  (Final Decision & Order ¶ 5.)

There is nothing in the Hearing Officer's decision to indicate that the psychiatric services were intended for diagnostic or evaluative purposes.  Rather, they were medical services needed to monitor an on-going medication regimen.  The Court finds that the Hearing Officer erred as a matter of law in holding that these were "related services" for which Putnam was responsible.  Accordingly, the Court grants summary judgment in favor of Putnam on it Counterclaim.

### *Conclusion*

For the reasons set forth above, the Court grants the Putnam Defendants' Motion for Summary Judgment in all respects.  Thus,

summary judgment should enter in favor of John Shea and Patricia Kline on counts two and five of plaintiffs' consolidated complaint, which were the only two counts asserted against them. Summary judgment should also enter in favor of the Putnam Board of Education on the second and fifth counts of plaintiffs' consolidated complaint, and on its counterclaim against plaintiffs. The Putnam Board of Education, however, remains a defendant as to count one of plaintiffs' complaint, which is plaintiffs' claim for attorneys' fees and costs under the IDEA

SO ORDERED, this ____6th___ day of June, 2008, at Bridgeport, Connecticut.


_____/s/ *William I. Garfinkel*___
WILLIAM I. GARFINKEL,
United States Magistrate Judge