UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

M.K., by and through his Mother    :
and Next Friend, MRS. K.,
                                   :
    Plaintiffs,
                                   :
        vs.                             No. 3:96cv00482(WIG)
                                   :
THEODORE SERGI, et al.,
                                   :
    Defendants.
                                   :
----------------------------------X

**RULING ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [# 232]**

Mrs. K., on behalf of and as next friend of her son, M.K., (collectively "plaintiffs"), has brought this action alleging that defendants violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, and her rights under the Due Process Clause of the Fourteenth Amendment to United States Constitution, made actionable under 42 U.S.C. § 1983. Named as defendants are Theodore Sergi, the former Commissioner of the Department of Education ("DOE"); Darlene Dunbar, the Commissioner of the Connecticut Department of Children and Families ("DCF"); Karl Kemper, the Regional Administrator for the Eastern Region of DCF; Carla Lebrun, Kemper's subordinate (collectively defendants Dunbar, Kemper, and Lebrun are referred to as the "DCF

1

defendants"); the Putnam Board of Education ("Putnam"); John Shea, the former Director of Student Services for Putnam; and Patricia Kline, his successor as Director of Student Services (collectively defendants Putnam, Shea, and Kline are referred to as the "Putnam defendants").

Plaintiffs' original complaint was filed in 1996, challenging certain aspects of the Due Process Hearing Officer's decision in Board of Education Case No. 95-353. Plaintiffs then filed a second suit in 2003, *M.K. v. Sergi, et al.,* No. 3:03cv1595(WIG), seeking to overturn certain portions of the Hearing Officer's decision in Board of Education Case No. 03-087. DCF also filed an action against Mrs. K. and M.K., *Department of Children and Families v. M.K. and Mrs. K.,* No. 3:03CV1658(WIG), challenging other aspects of the Hearing Officer's decision in Case No. 03-087. These three cases were consolidated. Over the course of this litigation, Plaintiffs amended their complaint four times, culminating in the last complaint filed on November 18, 2003, which is referred to by the parties as the "consolidated complaint," and which encompasses plaintiffs' claims in all cases.

The consolidated complaint sets forth seven counts. Count I is a claim for "costs, attorney's fees, and expert fees" against Putnam and DCF based on plaintiffs' status as prevailing parties in the due process hearings, Case Nos. 95-353 and 03-087. Count

II challenges certain aspects of the Hearing Officer's decisions.
Count III claims that DCF's policy and practice of placing
"arbitrary time limits" on certain home-based services as
compared to institutional services violate 28 C.F.R. § 38.130(b)
and are discriminatory, and that DCF's placement of arbitrary
time limits on the provision of services designed to prevent the
breakdown of the family unit violates 28 C.F.R. §
35.130(b)(3)(ii).  Count IV alleges that defendants Kemper and
LeBrun violated plaintiffs' rights secured by the ADA, § 504 of
the Rehabilitation Act, and § 1983 by virtue of certain actions
taken by them intentionally and/or in reckless disregard of
plaintiffs' federal rights.  Count V is addressed exclusively to
the Putnam defendants and alleges that they acted intentionally
and/or in reckless disregard of plaintiff's rights under the ADA,
§ 504 of the Rehabilitation Act, the IDEA, and 42 U.S.C. § 1983,
by establishing and implementing policies and procedures which
ensured that M.K. could not receive the support needed to be
educated in the Putnam schools and refusing to authorize the
Putnam PPT to make placement or program decisions after DCF
placed M.K. with DCF-funded services.  Count VI is brought
against defendant Sergi, the DOE Commissioner, for alleged
violation of the IDEA by virtue of his failing to put in place a
hearing process that would enable hearing officers to enter
orders against state agencies, such as DCF, which provide

services that might impact the provision of a free appropriate

public education ("FAPE") under the IDEA.  The last count, Count

VII, is brought pursuant to § 1983 against defendants Kemper and

LeBrun for their violation of plaintiffs' due process rights by

virtue of certain alleged intentional and/or reckless acts of

intimidation and retaliation set forth more fully in the

complaint.

Plaintiffs have now moved for partial summary judgment on

all counts of the consolidated complaint, except Count VII,[1] as

well as on DCF's appeal of certain aspects of the Hearing

Officer's decision in Case No. 03-087.  Most of the issues raised

by plaintiffs' motion have already been addressed by this Court

in four prior summary judgment rulings:  Ruling dated March 30,

2007, on Defendant Sergi's Motion for Summary Judgment [Doc. #

231]; Ruling dated May 12, 2008, on the DCF Defendants' Motion

for Summary Judgment [Doc. # 230]; Ruling dated May 12, 2008 on

Defendants M.K. & Mrs. K.'s Motion for Summary Judgment in

3:03cv1658 [Doc. # 275]; and Ruling dated June 6, 2008 on the

Putnam Defendants' Motion for Summary Judgment [Doc. # 227].  The

factual background of this case has been presented at length in

these rulings and will not be repeated herein, except as

---

[1]  Although plaintiffs have not moved for summary judgment
on Count VII, the Court has already considered that issue in
ruling on the DCF defendants' motion for summary judgment and
found in favor of defendants LeBrun and Kemper on this count.
(Ruling on DCF's Motion for Summary Judgment at 48-49.)

necessary for the resolution of any new issues presented by plaintiffs' motion.

## Summary Judgment Standard

The standard governing motions for summary judgment is well-settled. A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.* at 255. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

However, with respect to IDEA appeals, the court's inquiry is not directed to ascertaining whether there are disputed issues of material fact, but rather whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA processes and that the child's educational needs have been appropriately addressed. *A.E. v. Westport Bd. of Educ.*, 463 F. Supp. 2d 208, 215 (D. Conn. 2006). "The Supreme Court and [the Second] Circuit have interpreted the IDEA as strictly limiting judicial review of state administrative

decisions." *Collins v. Board of Educ. of Red Hook Central School Dist.*, 164 Fed. Appx. 19, 2006 WL 93102, at *2 (2d Cir. Jan. 9, 2006). Summary judgment has been described as the "most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions." *A.S. v. Norwalk Bd. of Educ.*, 183 F. Supp. 2d 534, 539 (D. Conn. 2002) (internal quotation marks and citations omitted).

Federal courts reviewing administrative decisions under the IDEA must base their determinations on a "preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." *Walczak v. Florida Union Free School Dist.*, 142 F.3d 119, 122-23 (2d Cir. 1998); *see also Grim v. Rhinebeck Central School Dist.*, 346 F.3d 377, 380 (2d Cir. 2003). Although the district court is required to engage in an independent review of the administrative record, this assessment "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Hendrick Hudson Dist. Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982) (considering the Education for All Handicapped Children Act, subsequently amended and renamed IDEA); *see also Cabouli v. Chappaqua Central School Dist.*, 200 Fed. Appx. 519, 521 (2d Cir. 2006). "The IDEA's statutory scheme requires 'substantial deference to state administrative bodies on matters of

educational policy.'" *A.E. v. Westport*, 463 F. Supp. 2d at 215
(quoting *Cerra v. Pawling Central School Dist.*, 427 F.3d 186, 191
(2d Cir. 2005)). "While federal courts do not simply rubber
stamp administrative decisions, they are expected to give due
weight to these proceedings, mindful that the judiciary generally
lacks the specialized knowledge and experience necessary to
resolve persistent and difficult questions of educational
policy." *Walczak,* 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at
206, 208 (internal quotation marks and citation omitted)); *see
also Cabouli*, 202 Fed. Appx. at 521; *Mrs. B. v. Milford Bd. of
Educ.,* 103 F.3d 1114, 1120 (2d Cir. 1997); *M.H. v. Monroe-
Woodbury Central School Dist.*, 250 Fed. Appx. 428, 430 (2d Cir.
2007) (reversing judgment of district court where it failed to
give "due weight" to the administrative findings); *Lillbask v.
Sergi*, 193 F. Supp. 2d 503, 508 (D. Conn. 2002) (in reviewing the
findings and decisions of the hearing officer, the Court must
afford deference and due weight to a hearing officer's findings
of fact). "Deference is particularly appropriate when, as here,
the state hearing officer's review has been thorough and
careful." *Walczak*, 142 F.3d at 129. Legal issues, however,
regarding the IDEA, other federal and state statutes, and due
process issues under the United States or state constitutions are
reviewed *de novo*, the rationale being that hearing officers do
not have greater experience or expertise than the courts on such

matters.  *See Lillbask*, 193 F. Supp. 2d at 508; see *also Mrs. B.*
*v. Milford,* 103 F.3d at 1122.

### Discussion

Applying the summary judgment standards set forth above, the
Court now turns to the seven issues raised by plaintiffs in their
motion for partial summary judgment.

### 1.  Defendants' Failure to Implement Hearing Officer's Decision

Plaintiffs first argue that defendants have failed to
implement certain provisions of the Hearing Officer's Order in
Case No. 03-087.[2]  Specifically, they claim that Putnam failed to
implement paragraph 4, which required it to pay for M.K.'s
psychotherapy to be provided by a therapist mutually agreed upon,
and paragraph 5, which required it to pay for psychiatric
supervision to appropriately manage M.K.'s medication regime.  As
relief, plaintiffs seek an order requiring compliance with the
Hearing Officer's Order, reimbursement for the costs paid by Mrs.
K. with her insurance, and one year of compensatory education to
compensate M.K. for the year of defendants' non-compliance.

The Court has already ruled on the latter claim (¶ 5) in its
decision on the Putnam defendants' motion for summary judgment.
The Court found that psychiatric supervision of M.K.'s ongoing

---

[2]  Although plaintiffs' motion states that they are
challenging the Putnam defendants' alleged failure to comply with
¶ 4 of the Hearing Officer's decision in Case No. 95-353, it is
clear from Mrs. K.'s affidavit that this relates to ¶ 4 of the
Order in Case No. 03-087, not Case No. 95-353.

medication regime was not a "related service" under the IDEA and, therefore, the Hearing Officer erred in requiring Putnam to pay for this service.

With respect to the first claim (¶ 4), the facts of record do not support plaintiffs' claim. Mrs. K. states in her affidavits that at the time of the due process hearing in 2003, DCF was paying for M.K.'s therapy with John Maloney. Mrs. K. was advised that she would have to pay for M.K.'s therapy through her medical insurance. When Mr. Maloney left the agency, Pioneer Valley Child & Family Services, in late June 2003, Mrs. K.'s insurance initially did not cover therapy with his replacement, Mr. Rose-Langston. Mrs. K. advised DCF and Putnam of this problem at the October 22, 2003 PPT meeting, yet neither offered to pay for the therapy. They suggested that she try to find another therapist that was acceptable to her insurance carrier. In December 2003, Pioneer Valley Child & Family Services assigned another therapist to M.K., but the therapy was not effective due to a poor relationship between M.K. and the therapist. In February, 2004, Mrs. K. called JoAnn Messina, Putnam's Director of Student Services, and told her that she wanted M.K. to resume therapy with Mr. Rose-Langston and reminded her that Putnam had been ordered to pay for this therapy. M.K. discontinued attending therapy. By letter dated March 2, 2004, Ms. Messina advised Mrs. K. that Putnam would pay for the therapy if her

private insurance refused coverage. Mrs. K. maintains, however, that Putnam never made arrangements with Pioneer Valley Child & Family Services to pay for the therapy. M.K.'s therapy resumed in June 2004, paid for by Mrs. K.'s medical insurance. As a result of the confusion over payment for the therapy and delays in reassigning therapists, plaintiffs claim that M.K. missed therapy from February 2004 to June 1, 2004, for which they seek one year's compensatory education. (Mrs. K.'s Aff. ¶ 75; Mrs. K.'s Supp. Aff. dtd. 11/8/04 at ¶¶ 3-16.)

Putnam responds that the Hearing Officer's order in August of 2003 was precipitated by DCF's representation that it would quit funding these services to M.K. upon his reaching the age of 18 (on August 31, 2003). As far as Putnam was aware, based on information it received at the PPT meetings, DCF funded M.K.'s therapy until October 2003. At the October 22, 2003, PPT meeting, Mrs. K. notified Putnam for the first time that M.K.'s therapist had left the agency and M.K. was no longer in therapy. Mrs. K. and a Mrs. Morrell from DCF were to look into securing a new therapist for M.K. (Putnam Ex. 5, 10/22/03 PPT Minutes.) The Minutes reflect that Mrs. K. agreed to use her own health insurance to cover this therapy. (*Id.*) On December 1, 2003, it was reported at the PPT meeting that M.K. was scheduled to meet with a new therapist that week (Putnam Ex. 6, 12/1/03 PPT Minutes), and by the December 16th PPT meeting, M.K. reported

that he had met with his new therapist and planned to see him every three weeks, although he questioned his need for therapy and felt that he had only an intermittent need for therapy. (Putnam Ex. 7, 12/16/03 PPT Minutes.)  In mid- to late February 2004, Mrs. K. reported to Putnam that M.K. wanted to switch therapists and that the new therapist was not covered by her insurance.  She requested that Putnam pay for M.K.'s therapy, and Putnam agreed to provide funding.  On March 2, 2004, Ms. Messina advised M.K. as to the process for switching therapists, and further advised him that the therapist he wanted to see, Mr. Rose-Langston, was now covered by his mother's insurance, but that if "for some reason insurance [would] not pick up this coverage, [Ms. Messina had] enclosed a letter for [him] that [would] authorize payment from the Putnam Public Schools." (Putnam Ex. 9).  The attached letter clearly stated that Putnam would assume financial responsibility for two one-hour sessions per month if private health insurance was unavailable.  (*Id.*)  At the March 24, 2004, PPT meeting, M.K. reported that he was not currently in counseling, although the Minutes do not indicate the reason for this.  (Putnam Ex. 10.)  The Minutes also reflect that Putnam had provided M.K. with a letter authorizing payment for counseling with Mr. Rose-Langston, his therapist of choice, and Mrs. K. indicated that her insurance would cover Mr. Rose-Langston's fees.  (*Id.*)

Putnam asserts that the issue concerning payment for M.K.'s counseling was quickly resolved, and Mrs. K. never again requested funding from Putnam. (Messina Aff. ¶¶ 10, 14, 18-50). Thus, Putnam maintains that this is a non-issue. Moreover, under the State's regulations, Conn. Agencies Regs. § 10-76h-16(e), Putnam argues, Mrs. K. was required to notify the Bureau of Special Education and Student Services of Putnam's alleged non-compliance, which she never did. Further, Putnam should not be responsible for a year's compensatory education, which is an equitable remedy designed to address gross and egregious violations of the IDEA, which have resulted in a child's being completely excluded from an educational placement or being wholly deprived of an education to which he was entitled, which did not happen here. *See Mrs. C. v. Wheaton*, 916 F.2d 69, 75 (2d Cir. 1990).

Plaintiffs' claim that Putnam failed to comply with the Hearing Officer's Order ¶ 4 is premised upon M.K.'s allegedly missing four months of therapy from February to June 1, 2004. The Minutes of the PPT meetings, which plaintiffs attended, belie this claim, and plaintiffs to not challenge the accuracy of these records. They reflect that as soon as Putnam was made aware that funding for M.K.'s therapy was a problem, Ms. Messina immediately took care of the problem and provided written authorization for Putnam to pay for any therapy not covered by

private insurance. While it appears that M.K. did not attend therapy in March, there is nothing in the record to suggest that this was due to any fault on the part of Putnam. The records indicate that M.K. did, in fact, attend the two therapy sessions scheduled for April and May. (Putnam's Ex. 12 & 13, Transition Goals & Objectives for 5/10/04 and 6/1/04.) The records clearly state that "Verbal reports from [M.K.], confirmed by [] and Mrs. [K.]" indicate that M.K. was seeing Mr. Rose-Langston and had attended the two appointments that were scheduled for April and another two in May. His goal of attending scheduled counseling was rated "accomplished."

The Court finds that plaintiffs have failed to carry their burden of proving that Putnam failed to comply with the Hearing Officer's Order ¶ 4, or that they suffered any damages as a result of Putnam's alleged failure to pay for therapy during this time period. Accordingly, the Court denies plaintiffs' motion for summary judgment on this ground.

## 2.  The Court Should Reverse The Hearing Officer's Decision That She Had Limited or No Jurisdiction Over State Agencies

Plaintiffs next ask this Court to overrule the Hearing Officer's determination that she had limited or no jurisdiction over the Connecticut Department of Children and Families (DCF) and the Connecticut Department of Education (DOE). This same issue was raised as to DOE in defendant Sergi's motion for summary judgment and as to DCF in the DCF's motion for summary

judgment and Mrs. K. and M.K.'s motion for summary judgment in Case No. 3:03cv1658.  As set forth in the Court's rulings on those motions, except in those instances in which DCF acts as the LEA, the proper respondent in a due process hearing is the local school board, the plaintiff's LEA, not DCF, even though DCF may be providing services that impact on the provision of a FAPE. Additionally, the Court held that plaintiffs' request that the Court order DOE to put in place a hearing process that would enable hearing officers to join *any* state agency which provides services that "*might* impact the provision of a free appropriate public education to a child identified as in need of special education and related services under the IDEA" would extend the hearing officer's jurisdiction to matters far beyond the reach of the IDEA.  In accordance with those rulings, the Court denies plaintiffs' motion for summary judgment on this claim.

**3.  The Court Should Overrule The Hearing Officer's Decision in Case No. 03-087 That Continuation of the Foster Placement Was Not Necessary for M.K. to Receive a FAPE**

Plaintiffs next argue that the Hearing Officer's decision in Case No. 03-087 that continuation of M.K.'s foster placement was not necessary for him to receive a FAPE was not fairly and rationally based on the record and was contrary to prevailing case law.  This issue was addressed in the Court's ruling on Putnam's motion for summary judgment.  The Court adheres to its finding based upon its review of the administrative record that

14

M.K. did not require a foster home placement in order to make educational progress and that the foster home placement was not a "related" service for which Putnam bore financial responsibility. (Ruling on Putnam's Motion for Summary Judgment at 42-48.) Therefore, the Court denies plaintiffs' motion for summary judgment as to this claim.

**4.  The Court Should Overrule the Hearing Officer's Determination That She Lacked Jurisdiction to Order That Special Education Services Be Provided at No Cost to The Family**

Plaintiffs next challenge the Hearing Officer's decision in Case No. 03-087 that she had no jurisdiction to enter an order holding plaintiffs harmless from any claim or lien that might be asserted against them by the State of Connecticut for services provided to M.K.  These charges primarily relate to residential placement costs.  Again, this Court has addressed this issue in its decision on DCF's motion for summary judgment and held that, because DCF has not asserted a lien against assets of Mrs. K. or M.K. or against any recovery in this lawsuit, this issue is not ripe for adjudication.  The Court again declines to provide an advisory ruling on a matter that is not yet ripe.

**5.  The Court Should Find That DCF Violated M.K.'s Rights Secured by the ADA and Enter Appropriate Remedial Orders**

Plaintiffs assert that they have established a prima facie case of discrimination under the ADA in that they have shown that the DCF defendants repeatedly failed and/or refused to make a professional judgment as to whether M.K. could live and be

educated in his home or home community, if necessary support
services were provided.  The Court ruled in favor of DCF on this
issue in its ruling on DCF's motion for summary judgment (Ruling
at 34-46) and adheres to that ruling.

## 6.  The Court Should Award Plaintiffs Money Damages for the Acts of Retaliation by the DCF Defendants

Plaintiffs have also asserted claims for unlawful
retaliation against defendants Karl Kemper, Regional
Administrator for the Eastern Region of DCF from May 1, 1998, to
April 5, 2002, and Carla LeBrun, who was M.K.'s case supervisor
form April to June 1998 and was a social worker with DCF from
June 1995 to March 1996.  The Court carefully reviewed these
retaliation claims in its ruling on DCF's motion for summary
judgment (Ruling at 29-34) and found that the DCF defendants were
entitled to summary judgment on all of these claims.
Accordingly, the Court denies plaintiffs' motion for summary
judgment in this respect.

## 7.  The Court Should Order Defendants to Reimburse Plaintiffs for Their Costs, Expert Fees, and Attorneys' Fees

Plaintiffs' last argument is addressed to Count I, their
claim for the recovery of attorneys' fees and costs incurred in
connection with the due process hearings and this consolidated
federal lawsuit, pursuant to 20 U.S.C. § 1415(i)(3)(B), based on
their status as "prevailing parties."  This issue has not been
addressed in any of the Court's prior summary judgment rulings

and will be addressed herein.

The IDEA provides that "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). "Fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished. No bonus or multiplier may be used in calculating the fees awarded under this subsection." 20 U.S.C. § 1415(i)(3)(C).

### a.  Prevailing Party Status

Under the IDEA's fee-shifting provisions, the first question that must be addressed is whether plaintiffs were "prevailing parties." The leading Supreme Court decision discussing the meaning of the term "prevailing party" is *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources,* 532 U.S. 598 (2001). In *Buckhannon*, the Supreme Court rejected the "catalyst theory," under which a plaintiff was deemed a "prevailing party" if his or her lawsuit achieved the desired result by bringing about a voluntary change in the defendant's conduct, even if there had been no judicially sanctioned change in the legal relationship of the parties. *Id.* at 601, 605. Instead, relying on the definition in *Black's Law Dictionary,* the Court held "a 'prevailing party' is one who has

been awarded some relief by the court." *Id.* at 603. Thus, the Court held, to be a "prevailing party," a plaintiff must have either secured a judgment on the merits or be a party to a settlement agreement that is expressly enforced by the court through a consent decree. *Id.*; *see also Lillbask v. State of Conn. Dep't of Educ.,* No. 3:97cv1202, 2006 WL 752872, at *2 (D. Conn. March 17, 2006). "The essential test for prevailing party status is whether a party successfully obtains a 'material alteration of the legal relationship of the parties.'" *C.C. v. Granby Board of Educ.,* 453 F. Supp. 2d 569, 573 (D. Conn. 2006)(quoting *Buckhannon*, 532 U.S. at 604). Additionally, that change must be judicially sanctioned. *Roberson v. Guiliani,* 346 F.3d 75, 79-80 (2d Cir. 2003) (citing *Buckhannon*, 532 U.S. at 603).

Although *Buckhannon* involved federal fee-shifting provisions in the Americans with Disabilities Act and the Federal Fair Housing Act Amendments, the Second Circuit has repeatedly applied the requirements of *Buckhannon* to the attorneys' fee provisions of the IDEA. *See A.R. v. New York City Dep't of Educ.*, 407 F.3d 65, 74 (2d Cir. 2005); *I.B. v. New York City Dep't of Educ.*, 336 F.3d 79, 80 (2d Cir. 2003); *J.C. v. Regional School Dist. No. 10*, 278 F.3d 119, 123 (2d Cir. 2002). Thus, the Second Circuit found that a plaintiff who obtained relief as a result of a hearing officer's order on the merits in an IDEA administrative

proceeding was a "prevailing party."[3]  *A.R.*, 407 F.3d at 75.  The

Second Circuit has further noted that in applying the prevailing

party standard, it is helpful to identify the relief sought by

the plaintiff and to compare it with the relief ultimately

obtained.  "[A] plaintiff may be considered a prevailing party

even though the relief ultimately obtained is not identical to

the relief demanded in the complaint, provided the relief

obtained is of the same general type."  *P. v. Newington Board of*

*Educ.,* 512 F. Supp. 2d 89, 113 (D. Conn. 2007) (citing *Koster v.*

*Perales*, 903 F.2d 131, 133-35 (2d Cir. 1990)).  Additionally, it

is not necessary for the plaintiff to prevail on all issues.  In

*P. v. Newington Board of Education*, 512 F. Supp. 2d at 113, this

Court held that the plaintiff, who had prevailed on three of five

significant issues before the administrative hearing officer, was

a "prevailing party" entitled to an award of fees.  And, in *Mr. &*

*Mrs. M. v. Ridgefield Board of Education*, No. 3:05cv584, 2008 WL

926518, at *2 (D. Conn. March 31, 2008), this Court found that

the plaintiffs, who had prevailed on some but not all of the

issues raised before the district court, were "prevailing

---

[3]  The Court reasoned that under the IDEA, a court may award
attorneys'fees to a "prevailing party" "[i]n any action or
*proceeding* brought under" the statute, 20 U.S.C. §
1415(i)(3)(B)(emphasis added), and since a "proceeding" includes
an administrative proceeding, "prevailing party" status may be
determined based upon results before a Hearing Officer.  *Id.; see*
*also Vultaggio v. Board of Educ.,* 343 F.3d 598, 602 (2d Cir.
2003).

parties."

Although defendants adamantly maintain that plaintiffs were
not prevailing parties, the Court disagrees. At the first
administrative hearing, the issues presented were:

> (1) Is Putnam and/or DCF responsible for providing services
> to M.K. in the home, school, and community such as (although
> not limited to) an in-home mentor, 24-hour on-call crisis
> response personnel and crisis plan, case management, inter-
> agency family team, respite care, and individual and family
> therapy?
>
> (2) Does a hearing officer have jurisdiction over DCF with
> respect to the provision of such services?
>
> (3) Did Putnam provide M.K. with a FAPE in the least
> restrictive environment?

(Final Decision and Order in Case No. 95-353 at 1.) The Hearing
Officer found that Putnam did not supply sufficient supplementary
aids and services with regard to M.K.'s behavior to consistently
maintain him in the least restrictive environment. (Concl. of
Law ¶ 3.) She further held that Putnam did not always follow the
expert advice that it received, such as that M.K.'s homework be
done at school with support, (*id.* at ¶ 5), and that the time-out
room was over-used, which did not deter poor conduct. (*Id.* at ¶
6.) The Hearing Officer ordered a consultant, Dr. Williams, to
develop a behavioral management plan to be implemented at home

and at school and to provide training to M.K.'s teachers, paraprofessionals, and family. (*Id.* at ¶ 7; Decision & Order at ¶ 3.) She found that Putnam never implemented any parent counseling and/or training. *(*Concl. of Law at ¶ 8.) She further found that M.K.'s IEP, except for the addition of a paraprofessional to provide behavioral support in the regular classroom, never changed to address his deteriorating behavior. (*Id.* at ¶ 9.) She ordered Putnam to re-assign a full-time paraprofessional to M.K.'s classroom upon his return to provide behavior support and to hire an educational consultant to assist the PPT in developing an appropriate IEP and to provide training and consultation to staff and to monitor the implementation of all components of M.K.'s educational program. (Decision & Order at ¶¶ 5 & 6.) She found that the PPT never received any ongoing expert advice as to M.K.'s medications and psychiatric condition, and ordered M.K.'s psychiatrist to serve as a clinical advisor to the PPT. (Concl. of Law at ¶ 10; Decision & Order ¶ 4.) On the other hand, she found that a 24-hour crisis plan with an on-call person for family support, respite care for the family, and an in-home mentor were not related services for which Putnam bore responsibility. (*Id.* at ¶ 23.) She also found that she had limited jurisdiction over DCF, but since DCF was acting as M.K.'s LEA at the time of the hearing, she ordered DCF to cooperate and provide input to the PPT in planning for M.K.'s transition back

into the Putnam schools. (*Id.* at ¶¶ 24-26; Decision & Order at ¶ 1.)

Based on the Court's review of the Hearing Officer's decision, the Court finds that plaintiffs prevailed on a substantial number of substantive issues as a result of the first administrative hearing that effected a significant alteration in their relationship with Putnam, and which was "judicially sanctioned" by virtue of the Hearing Officer's decision. The Court finds that plaintiffs were "prevailing parties" as to defendant Putnam, but not as to defendant DCF, the only other defendant against which plaintiffs seek an award of fees and costs.

With respect to the second administrative hearing, plaintiffs were less successful, yet they still succeeded on a substantial number of issues, particularly with respect to those involving transition services. The issues before the Hearing Officer were:

(1) Is M.K. eligible for services under the IDEA?

(2) Did the May 11, 2001 IEP provide M.K. with a FAPE?

(3) Did Putnam provide M.K. with appropriate transition services?

(4) Is Putnam responsible for paying for M.K.'s foster placement, therapy, and other support services provided by DCF?

(Final Decision & Order, Case No. 03-087, at 1.)

As the Hearing Officer's decision reflects, on the opening day of the hearing, Putnam reported that it was no longer contesting M.K.'s eligibility to receive special education services under the IDEA, thus rendering moot the first issue. With respect to the other issues, the Hearing Officer found that Putnam had not provided the appropriate transition services that M.K. required to move from high school to post-high school life and ordered Putnam to provide these services for a period of time to be determined by an independent consultant hired by Putnam, but at least through the 2003-04 school year. (Concl. of Law at ¶ 8; Final Decision & Order at ¶ 7.) She further held that the May 11, 2001 IEP was incomplete both as to his goals and his transition needs. (Concl. of Law at ¶ 10; Final Decision & Order at ¶ 2.) She ordered Putnam to provide psychiatric support for M.K.'s medication regime (which decision this Court has overruled), to pay for ongoing therapy, and to hire an independent consultant to oversee the creation and implementation of an IEP that contains appropriate transition plans and goals. (Concl. of Law at ¶¶ 11 & 12; Final Decision & Order at ¶¶ 3-5.)

On the other hand, she denied plaintiffs' request that Putnam pay for M.K.'s foster home, which finding this Court has affirmed. (*Id.* at ¶ 13.) She also denied the parents' request that she order Putnam to hold them harmless from any claim

asserted by the State for services provided by DCF, which this
Court also upheld.  (*Id.* at ¶ 19.)  Lastly, she declined to issue
an order prohibiting DCF from terminating services that it was
providing to M.K., except as otherwise set forth in her order.
(*Id.* at ¶ 20.)

Again, while plaintiffs did not succeed on every issue, they
did prevail on a significant number of substantive issues as to
Putnam, which changed the legal relationship of the parties and
renders them prevailing parties as to Putnam.

The proceedings in this Court, however, are another matter.
Except as to plaintiffs' claim for attorneys' fees and costs,
plaintiffs have not prevailed as to any defendant.  Obviously, at
the time the parties submitted their briefs on the issue of
attorneys' fees, they did not have the benefit of this Court's
rulings on the various summary judgment motions.  Those motions
have now been ruled on.  As discussed below, the Court will allow
plaintiffs and Putnam to address how plaintiffs' degree of
success affects a reasonable fee award under the IDEA.

### b.  The Fee Award

Having found that plaintiffs are prevailing parties at least
at the administrative hearing level, the Court must next
determine the amount of attorneys' fees to be awarded.  The
district court is afforded broad discretion in determining a
reasonable fee award based on the circumstances in the case.

*Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *see also* 20

U.S.C. § 1415(i)(3)(B).  Typically, the starting point for

calculating a reasonable fee award in IDEA cases in this District

and the Second Circuit has been the calculation of a so-called

"lodestar" figure, which is arrived at by multiplying the number

of hours reasonably expended in the litigation by a reasonable

hourly rate.  *See, e.g., A.R. v. New York City Dep't of Educ.,*

407 F.3d at 79-84; *Mr. & Mrs. M. v. Ridgefield Board of Educ.,*

2008 WL 926518, at **2-3; *C.C. v. Granby Board of Educ.,* 453 F.

Supp. 2d at 573-76.  Under the IDEA, the rates to be used in

calculating a fee award are the rates "prevailing in the

community in which the action or proceeding arose for the kind

and quality of services furnished."  20 U.S.C. § 1415(i)(3)(C).

By statute, no bonus or multiplier may be applied.  *Id.*

The Second Circuit has recently abandoned the use of the

term "lodestar" in *Arbor Hill Concerned Citizens Neighborhood

Ass'n v. County of Albany,* 522 F.3d 182, 189 (2d Cir. Apr. 10,

2008), a case brought under the Voting Rights Act.[4]  Instead, the

Court explained that the "better course" was for the district

court, in the exercise of its "considerable discretion, to bear

in mind *all* of the case-specific variables that we and other

---

[4]  The Second Circuit notes in a footnote that it did not
purport to require future panels of the Court to abandon the term
"lodestar," which was too well entrenched.  However, the panel in
the *Arbor Hill* case believed "that it is a term whose time has
come."  522 F.3d at 189 n.4.

courts have identified as relevant to the reasonableness of
attorney's fees in setting a reasonable hourly rate." *Id.*
(emphasis in original).  These factors include those set forth in
*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.
1974),[5] *abrogated on other grounds by Blanchard v. Bergeron*, 489
U.S. 87, 92-93 (1989), as well as the factors that other courts
have applied in determining what a reasonable, paying client
would be willing to pay.[6]  There is a great deal of overlap

---

[5]  The twelve *Johnson* factors are: (1) the time and labor
required; (2) the novelty and difficulty of the questions; (3)
the level of skill required to perform the legal service
properly; (4) the preclusion of employment by the attorney due to
acceptance of this case; (5) the attorney's customary hourly
rate; (6) whether the fee is fixed or contingent; (7) the time
limitations imposed by the client or the circumstances; (8) the
amount involved in the case and the results obtained; (9) the
experience, reputation, and ability of the attorneys; (10) the
undesirability of the case; (11) the nature and length of the
professional relationship with the client; and (12) awards in
similar cases.  *Arbor Hill,* 522 F.3d at 187 n.3 (citing *Johnson,*
488 F.2d at 717-19).

[6]  The Court held that, in determining what a reasonable,
paying client would be willing to pay, the district court should
consider, *inter alia*, the complexity and difficulty of the case,
the available expertise and capacity of the client's other
counsel (if any), the resources required to prosecute the case
effectively, the timing demands of the case, whether an attorney
might have an interest (independent of that of his client) in
achieving the ends of the litigation or might have initiated the
representation himself, whether an attorney might have initially
acted *pro bono* (such that a client might be aware that the
attorney expected little or no remuneration), and other returns
(such as reputation) that an attorney might expect to gain from
the representation.  *Arbor Hill*, 522 F.3d at 184.  Many of these
factors substantially overlap the *Johnson* factors.  *See Southern
New England Telephone Co. v. Global Naps, Inc.*, Case No.
3:04cv2075, 2008 WL 1848899, at *1 n.1 (D. Conn. Apr. 25, 2008).

between these factors.  The Court will apply those that it considers relevant to the circumstances of this case.

In an IDEA case, however, the statute specifically provides that the Court is not to apply a bonus or multiplier, the second step of the traditional "lodestar" methodology, *see Johnson*, 488 F.2d at 718-20, and, thus, it does not appear that the *Arbor Hill* decision has significantly changed the approach this Court should take in exercising its discretion to determine a "reasonable" attorneys' fee award.

Plaintiffs, as the fee applicants, bear the burden of "documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437.  Plaintiffs are seeking a "fully compensatory" fee in excess of $400,000.  The Supreme Court has held the plaintiff's degree of success is "'the most critical factor' in determining the reasonableness of a fee award." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)(quoting *Hensley*, 461 U.S. at 436).  In light of plaintiffs' lack of success in the District Court litigation, the Court does not intend to award a "fully compensatory" fee.  As this Court held in *P. v. Newington Board of Education*, 512 F. Supp. 2d at 114, the amount of a fee award under the IDEA should be reduced to reflect the extent of the success the plaintiff achieved.  Indeed, the Court noted in that case, the fact that the plaintiff was pursuing a federal court action was evidence that the plaintiff had not achieved all

of the relief sought.  Thus, this Court intends to reduce the fee award to reflect the extent of plaintiffs' success at both the administrative level and in the federal court litigation.

The IDEA provides that fees awarded must be reasonable. These consolidated cases have been tremendously over-litigated and over-briefed – although not just by plaintiffs' counsel.  The summary judgment briefs alone exceeded 1,000 pages in length, which has contributed in large part to the delays in the Court's rulings on these motions.  The Court intends to carefully scrutinize the records submitted by counsel to insure that the time was "usefully and reasonably expended."  *See Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994)(remanding award of attorneys' fees and directing the magistrate judge to review critically counsel's time records).[7]  The Court will exclude from

---

[7]  The Court must

> examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case.  Efforts put into research, briefing and the preparation of a case can expand to fill the time available, and some judgment must be made in the awarding of fees as to diminishing returns from such further efforts. . . . In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.

*Gierlinger*, 160 F.3d 858, 876 (2d cir. 1998) (quoting *DiFilippo v. Morizio*, 759 F.2d 231, 235-36 (2d Cir. 1985)).

the fee calculation hours that were not reasonably expended. *Hensley*, 461 U.S. at 434. Hours that are excessive, redundant, or otherwise unnecessary will not be awarded. *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998). This Court also intends to heed the Second Circuit's words of caution that "attorney's fees are to awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees." *New York State Assoc. for Retarded Children v. Carey*, 711 F.2d 1136, 1139 (2d Cir. 1983) (citations and internal quotations omitted).

The Court must also determine the appropriate rate for the attorneys' fees being awarded. David Shaw has requested a rate of $375 per hour for the work that he performed; $275 per hour for work performed by Attorney Feinstein; and $150 per hour for work performed by Attorney Fausey. The IDEA provides that a fee award must be based on rates prevailing in the community in which the action or proceedings arose for the kind and quality of services furnished. 20 U.S.C. § 1415(i)(3)(C). In making this determination, the Court intends to review recent fee awards in other IDEA cases in this District for attorneys with comparable experience.[8] Additionally, although much of the legal work in

---

[8] The Court notes that Judge Chatigny awarded Attorney Shaw fees in an IDEA case at the rate of $315 per hour in *C.C. v. Granby Board of Education,* 453 F. Supp. 2d at 574 (Sept. 30, 2006), as did Judge Thompson in *P. v. Newington Board of Educ.,* 512 F. Supp. 2d at 116 (Sept. 28, 2007).

this case was performed many years ago, the Second Circuit has held that "in order to provide adequate compensation where the services were performed many years before the award is made, the rates used by the court to calculate the lodestar should be 'current rather than historic hourly rates.'" *Gierlinger,* 160 F.3d at 882 (quoting *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989)).

Several times during the pendency of this action, plaintiffs' counsel filed motions to supplement his request for a fee award to add updated affidavits on prevailing rates. The Court denied these motions, stating that if and when the matter of attorneys' fees became relevant, counsel would be given ample opportunity to supplement his fee application both in terms of the number of hours requested and the hourly rate requested. To the extent that counsel considers it necessary to supplement his fee application, he will be given an opportunity to do so.

Additionally, plaintiffs seek an award of costs and expert fees in the amount of $16,567.22. An itemization of these costs was supposed to have been filed under seal as part of Exhibit "M." The sealed copy of Exhibit "M," however, does not contain a breakdown of these costs, although the Court suspects that the majority of these costs are expert consultants' fees. While the Court recognizes the importance of expert witnesses in a case such as this, after the filing of plaintiffs' motion, the Supreme

Court issued a ruling holding unequivocally that non-attorney expert's fees for services rendered to prevailing parents in an IDEA action are not recoverable "costs" under the IDEA's fee-shifting provision, 20 U.S.C. § 1415(i)(3)(B). *Arlington Central School District Board of Educ. v. Murphy,* 548 U.S. 291 (2006). Thus, these expert consultant fees will not be allowed. With respect to the other costs, at this juncture the Court cannot rule on which costs will be allowed.

Thus, the Court will allow both sides (plaintiffs and Putnam) to file supplemental briefs, not to exceed ten (10) pages, addressed solely to the issue of a reasonable fee award and costs in light of the Court's recent rulings on the summary judgment motions. The Court has the benefit of the briefs already filed, and the arguments made therein do not need to be repeated. Plaintiffs' counsel may also file the supplemental affidavits that he sought to file earlier addressing the reasonableness of his requested rate. Plaintiffs' counsel should also file an itemization of costs sought to be recovered, excluding all expert witness fees. Plaintiffs' briefs should be filed within twenty days of the date of this ruling. Defendant Putnam will have twenty days to respond. No reply briefs will be permitted without leave of Court.

## Conclusion

Accordingly, for the reasons set forth above, plaintiffs'

motion for partial summary judgment is DENIED as to all counts except as to Count I.  As to Count I, the Court finds that plaintiffs are "prevailing parties" as to defendant Putnam, but not as to defendant DCF.  Plaintiffs are entitled to recover a reasonable attorneys' fee award as part of the costs against defendant Putnam only, in an amount to be determined after the filing of supplemental briefs, as set forth above.

SO ORDERED, this ___9th___ day of June, 2008, at Bridgeport, Connecticut.


                           ___/s/ William I. Garfinkel___
                           WILLIAM I. GARFINKEL
                           United States Magistrate Judge